IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
CENTER FOR BIOLOGICAL DIVERSITY, *et al.* )
                                        )
        Plaintiffs,                     )
                                        )        Civ. Action No. 06-CV-1350 (GK)
            v.                          )
                                        )
STEPHEN L. JOHNSON, *et al.*            )
                                        )
        Defendants.                     )
_____)

## PLAINTIFFS' MEMORADUM IN OPPOSITION TO EPA'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER

Defendants Stephen L. Johnson and the United States Environmental Protection Agency ("EPA") have filed a Motion to Dismiss for Improper Venue, or, in the Alternative, to Transfer. Plaintiffs Center for Biological Diversity, Preston Forsythe, and Hilary Lambert (hereinafter "CBD") oppose this Motion for the reasons stated below.

## INTRODUCTION

This Court should decide the issues presented in this deadline suit/unreasonable delay action without the further delay of transferring this case to another venue that has no practical connection to this case. As explained below, the Tennessee Valley Authority ("TVA") has never received a valid Clean Air Act Title V permit to operate the Paradise Fossil Plant ("TVA Paradise") though Title V was passed in 1990 and the TVA Paradise application has been pending since 1997. TVA Paradise is a massive coal fired power plant that emits pollution which according to EPA leads to mortality and morbidity. Furthermore, according to EPA, TVA Paradise is not in compliance with the Clean Air Act. Despite this, EPA has not satisfied their

straightforward duties under the Clean Air Act to respond to the issues presented in CBD's petition for an objection to the permit proposed by Kentucky in 2004 or to issue a federal permit based on its own objection to the permit.  Nor has EPA required compliance with its instruction, issued as early as 1994, to amend the Kentucky State Implementation Plan to comply with the federal "Credible Evidence Rule."  Dismissal or transfer of this case to an inconvenient forum with no practical connection to this case would cause undue delay as well as unnecessary and unproductive expense and hardship to the public interest Plaintiffs and their *pro bono* counsel. The law of venue in this District presents no obstacle to the resolution of CBD's claims in this District.  Thus Defendants' Motion should be denied in its entirety.

Defendants argue that CBD's four claims for relief in this action must be dismissed because venue is improper as to the Third and Fourth Claims for Relief.  According to Defendants, dismissal or transfer to the Western District of Kentucky of all of CBD's claims is in the public interest and serves the interests of justice and judicial efficiency. On the contrary, venue is proper in this District, and the interests of justice and convenience weigh heavily against dismissing or transferring this case.  First, the most appropriate venue for CBD's First and Second Claims for Relief is the District of Columbia because most of the events or omissions giving rise to those claims occurred here, and Defendants and most of their counsel reside in this District.[1]  Second, under the doctrine of pendent venue CBD's Third and Fourth Claims for Relief should remain in this District.  Third, if the Court declines to exercise pendent venue, the case should be transferred to the Eastern District of Kentucky.

---

[1] Some of the events and omissions and one of Defendants' counsel are in Atlanta, Georgia at the EPA Region 4 Office.  It is also possible that some of the events and omissions occurred at EPA's Office of Air Quality Planning and Standards in North Carolina.

# BACKGROUND

## I.    LEGAL BACKGROUND

### A.    The Clean Air Act

Significant modifications to the existing federal air quality law were made in 1970 in response to urgent threats to public health posed by air pollution.  General Motors Corp. v. United States, 496 U.S. 530, 533 (1990).  The house committee reviewing the Clean Air Act in 1970 expressed support for the legislation, stating in its report that "the purpose of the [Act]...is to *speed up*, expand, and intensify the war against air pollution in the United States with a view to assuring the air we breath throughout the Nation is wholesome once again."  Act of Dec. 31, 1970, Pub. L. No. 91-604, 1970 U.S.C.C.A.N. (84 Stat.) 5356 (emphasis added).   Two major amendments to the Clean Air Act were passed to incorporate new programs aimed at achieving this goal, including provisions to prevent the significant deterioration of areas in attainment of the ambient air quality standards in 1977, and a federal "Title V" operating permit program in 1990.  P.L. 95-95, 91 Stat. 685 (1977); P.L. 101-549, 104 Stat. 2399, 2635 (1990).  Three major provisions of the Clean Air Act are relevant to this action: State Implementation Plans; Prevention of Significant Deterioration; and Title V Operating Permits.

### B.    State Implementation Plans

The major components of the Clean Air Act's cooperative federalism scheme are the State Implementation Plans or "SIPs," which must contain enforceable regulations to achieve and maintain the National Ambient Air Quality Standards ("NAAQS") set by EPA.  42 U.S.C. § 7410.  The SIPs must be at least as stringent as the federal laws, though they can be more stringent.  42 U.S.C. § 7410(a).

Though the SIPs are implemented by the states, the states must submit their proposed SIPs to EPA.  If the proposed SIP satisfies the requirements of the Clean Air Act, EPA promulgates the SIP through federal notice and comment rule making.  42 U.S.C. § 7410(a).   If a State fails to submit a SIP that meets the requirements of the Clean Air Act, EPA must itself promulgate a Federal Implementation Plan ("FIP") for that State.  42 U.S.C. § 7410(c).

The Clean Air Act authorizes EPA to initiate rulemaking proceedings and call for a SIP revision when the SIP is inadequate or fails to meet the requirements of the Clean Air Act ("SIP Call").  See 42 U.S.C. § 7410(k)(5).  According to EPA, "[i]f EPA makes such a finding it must require the state to submit, within a specified period, a SIP revision to correct the inadequacy." 62 Fed. Reg. 57,356, 57, 360 (Oct. 27, 1998)(emphasis added).  Once EPA issues a SIP Call, the Administer may establish "reasonable deadlines" for the submission of plan revisions, but those deadlines are "not to exceed 18 months" after the SIP Call.  42 U.S.C. § 7410(k)(5).

### C.    Prevention Of Significant Deterioration

Provisions for the prevention of significant deterioration of clean air areas were incorporated into the Clean Air Act in 1977. P.L. 95-95, 91 Stat. 685, 42 U.S.C. §§ 7401 *et seq.* (1978).  The Prevention of Significant Deterioration provisions include a permit program for major new sources of air pollution or major modifications to existing major sources of air pollution in areas that are in attainment of the national ambient air quality standards. 42 U.S.C. § 7475.  Under Prevention of Significant Deterioration, new or modified major sources in Prevention of Significant Deterioration areas are required to meet emission limitations reflecting the best available control technology ("BACT"), and ensure they will not cause or contribute to a violation of the national ambient air quality standards or site specific ambient air quality standards known as "increments."  42 U.S.C. § 7475, 7479; Alabama Power Co. v. Costle, 636

F.2d 323, 350 (D.C. Cir. 1979).[2]

The Prevention of Significant Deterioration program applies to new major sources of air pollution built after August 1977, as well as facilities built before 1977 if the source undergoes a "major modification." 42 U.S.C. § 7475; see U.S. v. Ohio Edison Co., 276 F. Supp. 2d 829, 832 (S.D. Ohio 2003). The exemption for existing sources was not intended to grant permanent immunity for all sources built before 1977. See Ohio Edison, 276 F. Supp. 2d at 850; Wisconsin Electric Power Company v. Reilly, 893 F. 2d 901, 909 (7th Cir. 1990). Despite these provisions making Prevention of Significant Deterioration applicable to existing source of air pollution when they make major modifications, in the past 30 years EPA did little to enforce these provisions until 1999. As a result, old, dirty coal-fired power plants have been repeatedly modified to extend their lives well beyond what could have been envisioned in 1977, all while avoiding the Prevention of Significant Deterioration provisions that would force them to lower the amount of pollution they emit by installing and operating modern pollution control equipment or other methods. See Ohio Edison, 276 F.Supp. 2d at 839-40. TVA Paradise is one such facility, as described below.

D.    **The Title V Program**

Congress enacted a major overhaul of the Clean Air Act in 1990. P.L. 101-549, 104 Stat. 2399, 42 U.S.C. § 7401 *et seq.* (1995). One significant new program from the 1990 Amendments was a federal operating permit program in Title V of the Act. P.L. 101-549, 104 Stat. 2399, 2635, 42 U.S.C. § 7661. The Title V permit program was necessary to "better enforce the requirements of the law by applying them more clearly to individual sources and

---

[2] The Prevention of Significant Deterioration program has several other requirements but these details are not relevant to this motion.

allowing better tracking of compliance." S. Rep. 101-228, 3729 (Dec. 20, 1989). Congress

believed that the program would ensure better enforcement of the multiple air pollution

requirements to which an individual source is subject. Id. at 3730.

As Senator Baucus, one of the managers of the 1990 Clean Air Act Amendments, which

created the Title V permitting program, explained:

> As much as any other aspect of the bill before us, permitting and
> enforcement issues go right to the heart of our commitment to
> provide clean and healthful air for the American people and to
> protect our natural resources. The simple fact is that in the success
> of this legislation, in meeting our public health and environmental
> objectives, we live or die with the program of source-by-source
> permits that we establish in this bill. Although in some cases, such
> as the acid rain title, emissions requirements will be imposed on
> individual sources even in the absence of permits or regulations, the
> legal instrument that will determine how much pollution a source
> can lawfully emit will be that source's permit. The permit program
> must operate correctly. Otherwise, much of what we are trying to
> accomplish in this legislation may be for naught.

136 Cong. Rec. S3162-04, S3188 (daily ed. March 26, 1990). This sentiment was echoed many

times during the congressional debates. See 136 Cong. Rec. S3233-03, S3238 (daily ed. March

27, 1990) (statement of Senate Majority Leader Mitchell) ("without an effective means of

assuring compliance with and enforcement of the act, the act has little meaning"); 136 Cong.

Rec. S2715-04, S2721 (daily ed. March 20, 1990) (statement of Senator Chafee) (the permits

title is "critical to the success of the Clean Air Act").

Congress also established the right of citizens to participate in each of the critical phases

of the permit process to defend their health, natural heritage, and other interests against air

pollution. Thus, members of the public have the opportunity to comment on draft Title V

permits, to petition EPA to object to a State proposed permit, to require EPA to respond to their

petitions within the 60 day statutory deadline, and to challenge EPA's failure to object in federal

court.  42 U.S.C. § 7661d(b)(2).

**E.      Credible Evidence Rule**

EPA promulgated the Credible Evidence Rule to clarify that compliance, or non-compliance, of

a source of air pollution need not be established solely through the "reference tests" specified in

regulations, but can be established using any credible evidence. 62 Fed. Reg. 8314 (Feb. 24,

1997).  According to EPA, the purpose of the Credible Evidence Rule is to clarify "EPA's,

states' and citizens' enforcement authorities under the Act," and "eliminate any potential

ambiguity regarding the use of nonreference test data.  Id.  EPA also issued "SIP calls" to

various states as early as 1994 requiring them to submit revised SIPs incorporating the Credible

Evidence Rule.  Id. at 8327[3]; See Clean Air Implementation Project v. Envt'l Protection Agency,

150 F.3d 1200, 1207 (D.C. Cir. 1998).  Unfortunately, EPA never completed this so that

Kentucky's State Implementation Plan still lacks the Credible Evidence Rule.

**II.      FACTUAL BACKGROUND**

**A.      The Effects Of Pollution From TVA Paradise**

TVA Paradise is a dirty, old, coal-fired power plant located on the Green River in

Muhlenberg County, Kentucky.  TVA began operating Paradise in 1963.  TVA Paradise burns

over seven million tons of coal each year, and is one of the largest sources of air pollution in the

nation.  In 2005, TVA Paradise emitted well over 100,000 tons of pollution into the air.  That

---

[3] In October, 1993, EPA announced that it planned to issue a SIP call for the credible evidence revision.  58 Fed. Reg. 54648, 54659-60 (Oct. 22, 1993).  In December, 1993, and February, 1994, the Office of Air and Radiation's Stationary Source Compliance Division issued memoranda to EPA's Regional offices instructing them to conduct the SIP call, and EPA continued the SIP call in its February 1997 Federal Register notice of the credible evidence revisions.  62 Fed. Reg. 8314, 8327 (Feb. 24, 1997).

pollution does not rest idly in the atmosphere over western Kentucky.  Power plant pollution travels great distances and reacts in the atmosphere to form a variety of harmful compounds, the effects of which are experienced in downwind states and distant water bodies. For example, in Ohio Power Co v. US EPA, EPA acknowledged that the pollution from three Ohio power plants contributed to acid rain in areas as far away as New England and Eastern Canada. 729 F.2d 1096, 1097 (6th Cir. 1984).

TVA Paradise emits Sulfur dioxide ("$SO_2$").  In Ohio Power Sixth Circuit observed that "there is now no longer any doubt that high levels of pollution sustained for periods of days can kill," and that long-term exposure to $SO_2$ produces significant health effects, including "[a]cute respiratory infections in children, chronic respiratory diseases in adults, and decreased levels of ventilatory lung function in both children and adults."  729 F.2d at 1098.  Sulfur dioxide also reacts with oxygen and other substances in the atmosphere to form sulfate aerosols and sulfuric acid mist, which are dangerous to human health and can remain airborne for days and affect areas far downwind.  Id.   Sulfuric acid also contributes to impaired visibility. $SO_2$ emissions from coal-fired power plants also contribute to acid deposition (acid rain), which damages building materials and has deleterious impacts on plants and fish.  U.S. EPA, *Latest Findings on National Air Quality, 2002 Status and Trends Summary* 12 (2002) available at <http:www.epa.gov/air/airtrends/aqtrnd02/2002_airtrends_final.pdf> (hereinafter "2002 Air Trends").

TVA Paradise also emits large quantities of Nitrogen Oxides (NOx), which causes asthma attacks, respiratory tract symptoms, bronchitis, and decreased lung function.  Committee on Environmental Health, American Academy of Pediatrics, "Ambient Air Pollution: Health Hazards to Children," Pediatrics 2004: 114: 1699-1707, at 1701 (attached at Exhibit 1).  NOx

emissions directly result in nitrogen deposition in the aquatic and terrestrial ecosystem. See 70 Fed. Reg. 8892 (Feb. 23, 2005). Elevated soil nitrogen levels exacerbate the effects of acid deposition described above. Id. at 8893. Elevated nitrogen levels in water contribute to eutrophication, which depletes dissolved oxygen and can lead to "dead zones" in water bodies. EPA has stated that "airborne releases of NOx are the largest source of nitrogen pollution in certain water bodies, such as the Chesapeake Bay." 2002 Air Trends, p. 2, 6.

NOx emissions from coal-fired power plants also contribute to the formation of ground level ozone. Ozone is the main ingredient in smog. According to EPA, short-term ozone exposure "can irritate the respiratory system, causing coughing, throat irritation, and chest pain … reduce lung function and make it more difficult to breathe deeply." 70 Fed. Reg. 25162, 25169 (May 12, 2005). Exposure to ambient ozone also exacerbates asthma, causing increased asthma attacks, and increases hospital admissions and emergency room visits due to respiratory problems. Id. Longer-term exposure can lead to permanent and irreversible decreases in lung function. Id. Sadly, active children are one of the groups at the highest risk from ozone exposure. Id. Courts have recognized that ozone is very harmful to human health. See e.g. 1000 Friends of Maryland v. Browner, 265 F.3d 216, 220, n.2 (4th Cir. 2001). Ozone also causes damage to vegetation and wildlife. 70 Fed. Reg. 25162, 25169. EPA acknowledges that ozone and its precursor pollutants can travel hundreds of miles from their sources. 2002 Air Trends, p. 8. Sources in Kentucky contribute to nonattainment of the ozone National Ambient Air Quality Standards in Ohio, Michigan, and Georgia. 70 Fed. Reg. 25162, 25249 Table VI-9.

SOx and NOx emissions are precursor chemicals to fine particulate matter.[4] 70 Fed. Reg. 25162, 25162.  Fine particulate matter pollution causes a variety of adverse health effects, including premature death, heart attacks, strokes, birth defects, and asthma attacks. 71 Fed. Reg. 2620 (Jan. 17, 2006). In the most recent review of the fine particulate matter health based ambient air quality, EPA was unable to discern a threshold level of pollution under which the death and disease associated with PM would not occur.  Id. at 2635.  Studies reviewed by EPA revealed a linear or almost linear relationship between diseases like cancer and the amount of fine particulate matter in the ambient air.  Id.  Put simply, the more fine particulate matter TVA Paradise and other sources emit into our air, the more death and disease.

## B.    Prevention Of Significant Deterioration Enforcement At TVA Paradise

EPA's execution of the Prevention of Significant Deterioration represents an "abysmal breakdown in the administrative process."  Ohio Edison, 276 F. Supp. 2d at 832.  After over thirty years of relative inaction, in 1999 the Department of Justice filed 51 lawsuits in 10 states alleging violations of the new source review programs related to major modifications of existing sources.  In addition, EPA issued a Compliance Order to TVA rather than a lawsuit, presumably because TVA is a federal agency, for its violations of the Clean Air Act, including the Prevention of Significant Deterioration, at nine of its coal-fired power plants.  In re Tennessee Valley Authority, CAA 2000-04-008, 9 E.A.D. 357, 367 (Sept. 15, 2000), *rev'd*, Tennessee Valley Authority v. Whitman, 336 F.3d 1236 (11th Cir. 2003).  EPA could have filed an enforcement action in the United States District Court for the Western District of Kentucky but instead chose to pursue its enforcement action in Washington, D.C. in front of the Environmental Appeals

_____

[4] Fine particulate matter is solid or aerosol particals with an aerometric diameter of less than 2.5 microns and is referred to in Clean Air Act jargon as PM2.5.

Board.  EPA "found that TVA violated the Clean Air Act when it made certain physical changes to fourteen of the boiler units at nine of its power plants without having first obtained permits under the Clean Air Act authorizing TVA to commence construction or modification of the plants."  Id.  at 367.  TVA Paradise was one of those plants. Id. at 365.      The Environmental Appeals Board which sits in Washington, D.C. upheld the EPA's determination that TVA violated the Prevention of Significant Deterioration permitting requirements at Paradise units 1, 2 and 3 with regard to NOx.  Id.  at 382.  The Environmental Appeals Board found that in 1984, as part of an extensive effort to extend the useful lives of its coal-fired power plants, TVA embarked on a series of significant improvement projects at TVA Paradise.  Id.  at 398.  These projects increased actual NOx emissions in the two years following the projects by 12,102 tons per year.  Id. at 443.  The Environmental Appeals Board concluded that these projects, despite TVA's efforts to obfuscate the true purpose, constituted major modifications for which Prevention of Significant Deterioration requirements should have been met.  Id. at 478.

The Eleventh Circuit Court of Appeals, not the Sixth Circuit, reversed the Environmental Appeals Board's decision in Tennessee Valley Authority v. Whitman, 336 F.3d 1236 (11th Cir. 2003).  Two judges on the three judge panel filed a concurrence, thus the court's opinion is that of one judge.  Regardless, the court held that it lacked jurisdiction to review the administrative compliance order issued to TVA because it was not a final agency action. Id. at 1240.  The court based its decision on its conclusion that the provision of the Clean Air Act that allows EPA to issue administrative compliance orders that have the status of law is "unconstitutional to the extent that severe civil and criminal penalties can be imposed for noncompliance with the terms of an [administrative compliance order]." Id.  The court instructed EPA that until it proves the new source review violations in district court, TVA is free to ignore EPA's enforcement efforts.

Id. The court did not review the substance of the underlying allegations and did not find that TVA had not violated the Clean Air Act. Instead of pursuing TVA's violations of the Clean Air Act through a judicial enforcement action, however, EPA did nothing. EPA's inaction is disturbing in the face of the agency's own evidence that pollution from TVA Paradise is illegal and contributes to the death, disease, and ecosystem effects described, and EPA's knowledge that TVA pursued a program of short-term economics before compliance.

### C.    TVA Paradise's Title V Permit

Although Title V was passed as part of the 1990 Amendments to the Clean Air Act, it was not until February 7, 1997, that TVA applied for its first Title V permit. Over **six** years later, the Kentucky Division for Air Quality ("DAQ") issued a draft Title V operating permit for TVA Paradise on August 18, 2004. This six year delay is particularly troubling because the Clean Air Act mandates that a state issue all of the initial Title V permits within three years. 42 U.S.C. § 7661b(c).

On September 14, 2004, CBD submitted comments to Kentucky DAQ on the TVA Paradise draft permit. CBD's main comment was that Prevention of Significant Deterioration was an applicable requirement to TVA Paradise but that the TVA Paradise Title V permit did not include the Prevention of Significant Deterioration provisions like requiring compliance with the Best Available Control Technology emission limits for NOx. CBD's evidence in support of this comment was the evidence EPA submitted to the Environmental Appeals Board. Kentucky DAQ issued what it labeled as the final permit on December 29, 2004. This permit, like the draft, did not include the Prevention of Significant Deterioration requirements despite CBD's comment. On January 7, 2005, Kentucky DAQ proposed the permit to EPA in an effort to comply with 40 C.F.R. § 70.7(a)(v) and the states own regulations. This permit which Kentucky

DAQ forwards to EPA is referred to as a "proposed permit." Over two weeks after issuing what it labeled as the final permit, Kentucky DAQ responded to CBD's comments on January 13, 2005.

On its own initiative, EPA objected to the permit on February 18, 2005 via a letter from EPA's Beverly Banister in EPA Region 4 in Atlanta, Georgia. The letter lists two EPA employees who should be contacted if there are questions or a desire to discuss the issue. Both are in Atlanta, Georgia. The letter was carbon copied to TVA's Janet Watts, in Chattanooga, Tennessee. EPA's objection rested on two grounds: (1) that a heat input limit contained in a State Operating Permit that was incorporated into the Kentucky SIP was not included in the TVA Paradise Title V permit; and (2) that the permit did not include adequate monitoring for the two lime storage silos and handling system. CBD had not included the first ground in its petition for an objection. EPA did not publicly disclose this objection, and did not provide notice of the objection to Plaintiffs. EPA did not even place its objection letter to the TVA Paradise Title V permit on its webpage where EPA had placed its other objection letters. EPA's objection did not address the Prevention of Significant Deterioration issue identified by CBD, and it did not address six other substantive grounds for an objection that CBD presented in its comments. EPA's 45-day review period expired on February 21, 2005.

CBD submitted a petition to EPA which EPA received on April 21, 2005. CBD's petition requested, pursuant to 42 U.S.C. § 7661d(b)(2), that EPA object to the TVA Paradise Title V permit based on the same substantive grounds that CBD presented in its comments to Kentucky DAQ, including, *inter alia*, the applicability of Prevention of Significant Deterioration to TVA Paradise units 1, 2 and 3.

CBD's petition also sought an objection to the TVA Paradise Title V permit based on the fact that it did not contain a provision implementing the Credible Evidence Rule.  CBD stated in its petition, however, that if EPA believed that the fault lied in the fact that the Kentucky SIP did not contain the Credible Evidence Rule and that fault prevented EPA from requiring the Credible Evidence Rule in the TVA Paradise Title V permit, EPA should consider CBD's petition as an Administrative Procedures Act ("APA") petition for EPA to conduct a SIP Call to correct Kentucky's SIP by inserting the Credible Evidence Rule into it.  It is over a year and a half since CBD submitted its Title V and APA petition and EPA has still not responded to the petition.

After CBD filed this case, however, Kentucky withdrew the proposed permit it issued to TVA Paradise, and EPA claims that "Kentucky never issued a final permit." Memorandum in Support of EPA's Motion to Dismiss for Improper Venue, or, In the Alternative, To Transfer ("EPA Brief"), p. 5 n.1.  Assuming that EPA is correct, however, the TVA Paradise plant has been operating for the past sixteen years, and continues to operate, without a valid Title V operating permit.

In a letter dated October 5, 2006, which CBD discovered on October 19, 2006, through a public records request, EPA's Beverly Banister in Atlanta, Georgia informed TVA Janet Watts in Chattanooga, Tennessee that it must apply for a federally issued Title V permit within nine months.  EPA also stated that TVA would be granted an "application shield" if it complies with the request, preventing any future challenges to TVA's operation of Paradise without a Title V Permit. TVA's February, 1997, application to Kentucky DAQ, which also purported to provide an "application shield," has essentially prevented citizens from directly challenging TVA's operation of Paradise without a Title V permit for almost a decade.

**D.      The Kentucky SIP And The Credible Evidence Rule**

After Plaintiffs sent a letter informing EPA and the Administrator of their intent initiate this action, the Kentucky DAQ proposed a credible evidence revision to its rules on December 15, 2005.  The proposed regulation was published in the January 1, 2006, Administrative Register of Kentucky.  32 Admin. Reg. Ky. 1348-49 (Jan. 1, 2006).  The proposed regulation provided:

> [A]ny credible evidence, including but not limited to testing and monitoring methods other than the reference test method, may be used for determining compliance and for establishing violations of the underlying emission limitation and standard.

Id.  A public hearing was held on January 24, 2006.  Unfortunately, Kentucky DAQ withdrew the proposed regulation as of March 15, 2006 because Kentucky DAQ claims it received an adverse comment, presumable from the owner or operator of a major source of pollution.  32 Admin. Reg. Ky. Locator Supp. L-10 (June, 2006).   Kentucky has not renewed its proposal.  Years have passed since EPA announced its intention to issue SIP Calls to the states, and the Credible Evidence Rule has been part of federal air pollution law since 1997.  Still, EPA has not required Kentucky to amend its SIP, or to promulgate a Federal Implementation Plan for Kentucky including the Credible Evidence Rule.  Rather, the statement of basis to support the permit issued to TVA by Kentucky on December 29, 2004, explains that compliance demonstration is limited to the test methods specified in the permit, and that the Credible Evidence Rule does not apply in Kentucky.  See *Statement of Basis Title V (Draft) No. V-04-024* (revised date March 9, 2005) available at <http:www.air.ky.gov/permitting/ Tennessee+Valley+Authority.htm>.

## STANDARD OF REVIEW

In deciding a motion to dismiss under Federal Rule of Civil Procedure ("FRCP") 12(b), courts construe plaintiffs' allegations favorably.  Freeman v. Fallin, 254 F. Supp. 2d 52, 56 (D.D.C. 2003)(citing Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683 (1974), *overruled on other grounds* Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, (1982); Walker v. Jones, 733 F.2d 923, 925-26 (D.C.Cir.1984)). Though the plaintiff bears the burden to show that venue is proper for each claim, if an improperly venued claim is really just a different ground for relief in the same cause of action, a properly venued claim for relief will support venue for the improperly venued claim.  Beattie v. United States, 756 F.2d 91, 101 (D.C.Cir.1984), *overruled on other grounds, sub nom.* Smith v. United States, 507 U.S. 197, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993).  Additionally, under the doctrine of pendent venue a court may allow plaintiff to pursue claims for which venue would not be individually proper. Id.; Burnett v. Al Baraka Inv. And Development Corp, 274 F. Supp. 2d 86, 98 (D.D.C. 2003)(citing Johnson v. Washington Gas Light Co., 89 F.Supp.2d 45, 47 (D.D.C.2000)). In determining whether to permit improperly venued claims to proceed under the doctrine of pendent venue, the District of Columbia Circuit Court of Appeals has principally considered whether the claims originate from a common nucleus of operative fact as a test that "in itself, embodies factors that bear upon judicial economy, convenience, and fairness." Beattie, 756 F.2d at 103. The existence of similar witnesses and common issues of proof for each claim are also relevant considerations in applying the pendent venue doctrine.  Burnett,  274 F. Supp. 2d at 98.  Other factors include "judicial economy, convenience, avoidance of piecemeal litigation, [] fairness to the litigants …[and] convenience of litigants and witnesses … [and] the convenience of the court system." Beattie, 756 F.2d at 103. Thus, the decision of whether to exercise pendent venue is an exercise of the

court's discretion in balancing a variety of competing policies and factors, paramount of which is a common nucleus of operative facts.  Id.

If the Court declines to exercise pendent venue, the decision of whether transfer or dismissal is in the interest of justice is within the sound discretion of the district court.  Davis v. American Society of Civil Engineers, 290 F. Supp. 2d 116, 120 (D.D.C. 2003).  Transfer to a proper venue, rather than dismissal, generally serves the interest of justice.  Id. (citing Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466-67, 82 S. Ct. 913 (1962).


## ARGUMENT

### I.    THE DISTRICT OF COLUMBIA IS THE MOST APPROPRIATE VENUE FOR CBD'S FIRST AND SECOND CLAIMS FOR RELIEF.

EPA admits that this District is a proper venue for CBD's First and Second Claims for Relief.  EPA Brief, p. 12.  In fact, the District of Columbia is the most appropriate venue for those claims.  As explained below, CBD's First and Second Claims for Relief seek to compel non-discretionary duties and are subject to the general federal venue provision, 28 U.S.C. § 1391.  Moreover, CBD's First Claim for Relief challenges the Administrator's failure to satisfy a duty that he is statutorily precluded from delegated to others, in Kentucky or elsewhere.

CBD's First Claim for Relief challenges the Defendants' failure to respond to CBDs petition for an objection to the TVA Paradise Title V permit within 60 days as required by 42 U.S.C. § 7661(b)(2).  Complaint, p. 24.  Venue is appropriate under 28 U.S.C. § 1391 because the decision maker and the relevant documents are located in this District.  The petition was addressed to the Administrator and processed by the Office of General Counsel in the District of Columbia.  To the extent that other EPA employees are involved in processing this petition, they would be in EPA Region 4 in Atlanta or EPA OAQPS in North Carolina.  EPA does not have an

office in the Western District of Kentucky that deals with air permitting issues.[5]  Most

importantly, the Clean Air Act itself forbids the Administrator from delegating his responsibility

to respond to Title V petitions.  42 U.S.C. § 7661d(b)(2).[6]  CBD challenges the failure of the

Administrator to act as directed by the statute, not the failure of Kentucky to properly administer

of the Title V program in Kentucky.  This Court has regularly entertained claims like this where

plaintiffs are challenge the EPA's Administrator's failure to comply with the 60 day deadline in

42 U.S.C. § 7661d(b)(2).  See e.g. New York Public Interest Research Group and Sierra Club v.

Whitman, 214 F. Supp. 2d. 1 (D.D.C. 2002); Sierra Club v. Johnson, 05-cv-750 (ESH)(D.D.C.

2005); Sierra Club v. Johnson, 05-cv-2177 (RMC)(D.D.C. 2005);  Nichols v. Johnson, 05-cv-

2215(RCL)(D.D.C. 2005); Rocky Mountain Clean Air Action v. Johnson, 06-cv-1419

(RMC)(D.D.C. 2006).  In none of these cited cases has EPA ever challenged venue even though

none of these cases involved Title V permits for sources of pollution located in the District of

Columbia.  Plaintiffs have chosen this Court as their forum.  The omission complained of in the

first claim arose in the District of Columbia because, as explained above, the Administrator must

grant or deny the petition.  Thus, the evidence and witnesses are in the District of Columbia and

to extent they are not, they would be in Atlanta, Georgia or Research Triangle Park, North

Carolina, not the Western District of Kentucky.  EPA's counsel is obviously conveniently

located in Washington, D.C.  Furthermore, although undersigned counsel lives in Kentucky for

personal reasons, he has practiced more cases in this Court than in any other court.  He is not

even a member of the bar of the Western District of Kentucky and has never filed a case in any

---

[5] Plaintiffs assume that EPA does not have any sort of office in the Western District of Kentucky.
[6] EPA agrees that the Administrator cannot delegate his duty to respond to a petition for
objection under 42 U.S.C. 7661d.  See Defendant's Unopposed Motion to Extend Time to
Answer, Docket No. 8 at page 2, filed in Rocky Mountain Clean Air Action, et al. v. Johnson,
Civ. No. 1:06-cv-1419 (RMC) (Oct. 16, 2006) (attached hereto as Exhibit 2).

court in Kentucky. Plaintiff CBD is headquartered in Tucson, Arizona and Plaintiff Hilary Lambert lives in Lexington, which is in the Eastern, not Western, District of Kentucky. Thus, this District is the most appropriate forum for CBD's First Claim for Relief.

CBD's Second Claim for Relief challenges the Defendants' failure to modify, terminate or revoke the TVA Paradise Title V permit and issue or deny the permit themselves. Complaint, p.25. This challenge is also most appropriately venued in the District of Columbia. Again, Defendants reside in the District of Columbia, and the relevant documents and decision makers are located in this District and possibly Atlanta, Georgia and/or Research Triangle Park, North Carolina. EPA has no staff or records in Kentucky relevant to this case. The challenge is not to Kentucky's administration of its Title V program, but to EPA's failure to satisfy its mandatory duty to take action under the Clean Air Act. The only other arguably appropriate venues are the Northern District of Georgia, where EPA's Region 4 is located and some decision makers or records may be found, and the Eastern District of North Carolina, where EPA's Office of Air Quality Planning and Standards is located. Defendants have not moved to transfer to those Districts, however, and such transfer would be inappropriate as explained in Section III below. Thus, EPA does not dispute that the First and Second Claims find proper venue in this Court which is also the most appropriate venue.

## II.    VENUE IN THE DISTRICT OF COLUMBIA IS PROPER FOR CBD'S THIRD AND FOURTH CLAIMS FOR RELIEF.

Plaintiffs need not establish that venue is proper for CBD's Third and Fourth Claims for Relief in this District. Venue for CBD's Third Claim for Relief is supported by proper venue for the First and Second Claims for Relief, and venue for the Third and Fourth Claims for Relief are appropriate for resolution in this District under the pendent venue doctrine. As explained below, exercise of venue over the Third and Fourth Claims for relief is appropriate because (1) venue is

not limited by the specific Clean Air Act venue provisions; (2) the Second and Third Claims for Relief comprise one cause of action with multiple grounds for relief; and (3) all Claims for Relief arise from a common nucleus of operative facts and venue in this District serves the interests of convenience, judicial efficiency, and fairness.

### A.    Plaintiffs Need Not Establish Proper Venue For The Third and Fourth Claims For Relief.

In Beattie v. United States, the District of Columbia Circuit described two types of cases in which venue need not be established for each claim for relief. 756 F.2d at 100-104. The first of these is a case that amounts to one cause of action with multiple grounds for relief, in which proper venue as to one federal ground supports venue for the others.[7] Id. at 100. The second is a case in which improperly venued claims for relief and properly venued claims arise from the same nucleus of operative facts, which is the pendent venue doctrine. Id. at 102 (citing Laffey v. Northwest Airlines, 321 F. Supp. 1041 (D.D.C. 1971); Zenith Radio Corp. v. Matsushita Electric Industrial Co., 402 F. Supp. 262 (E.D. Pa. 1975)). Courts following Beattie have also considered whether the properly venued claim is the primary claim. See Burnett, 274 F. Supp. 2d at 98; Solow Building Co., LLC v. ATC Associates, Inc., 175 F. Supp. 2d 465 (E.D.N.Y., 2001).

### B.    The Clean Air Act Venue Provisions Do Not Limit This Court's Discretion To Hear This Case.

EPA argues that the applicability of the 42 U.S.C. § 7604(a) venue provisions means that only a district court in the Sixth Circuit can hear CBD's challenge to the Defendants' unreasonable delays. EPA Brief, pp. 8-10[8]. The applicability of 42 U.S.C. § 7607(b) to CBD's

---

[7] For ease of discussion, this type of case will be referred to hereinafter as a "single cause of action theory."

claims is irrelevant to the application of the single cause of action theory or the pendent venue

doctrine, however.  In Beattie, the court applied both the single cause of action theory and

pendent venue to claims under the Federal Tort Claims Act, despite the restrictive venue statute

applicable to those claims.  Beattie, 756 F. 2d at 100.  The statute at issue, 28 U.S.C. § 1402(b),

provided that a tort claim against the United States "*may be prosecuted only* in the judicial

district where the plaintiff resides or wherein the act or omission complained of occurred."  28

U.S.C. § 1402(b)(1982) (emphasis added).  The plaintiffs did not reside in the District of

Columbia, and the acts or omissions complained of did not occur in the District of Columbia, but

the court exercised its discretion under both the single cause of action theory and the pendent

venue doctrine to hear the claims.  The Clean Air Act venue provision at 42 U.S.C. § 7607(b),

while not verbatim, is sufficiently similar to 28 U.S.C. § 1402(b), that the holding of the Beattie

court is directly on point.  42 U.S.C. § 7607(b) states that a challenge to a final agency action of

local or regional applicability "*may be filed only* in the United States Court of Appeals for the

appropriate circuit," which is no more restrictive than 28 U.S.C. § 1402(b)'s mandate that a tort

claim "*may be prosecuted only* in the judicial district where the plaintiff resides or wherein the

act or omission complained of occurred."   Thus, nothing in 42 U.S.C. § 7607(b) precludes the

application of the single cause of action theory or the pendent venue doctrine.   See also Solow

Building Co., LLC, 175 F. Supp. 2d at 470 (declining to dismiss action with properly venued

declaratory judgment claim and improperly venued Clean Air Act enforcement claim arising

from same operative facts).

---

[8] EPA does not argue that 42 U.S.C. §§ 7604(a) or 7607(b) limit the jurisdiction of the Court to
hear CBD's claims.  See generally Texas Mun. Power Agency v. EPA, 89 F.3d 858, 867 (D.C.
Cir. 1996). (restrictions on venue in 42 U.S.C. § 7607(b), which contains similar language to 42
U.S.C. § 7604(a), are not jurisdictional).

**C.    The Second And Third Claims For Relief Amount To One Cause of Action With Two Grounds For Relief.**

In <u>Beattie</u>, the plaintiffs sought relief for wrongful death resulting from a plane crash in Antarctica.  <u>Beattie</u>, 756 F.2d at 93.  The plaintiffs alleged that negligence of Navy officials in Washington, D.C., and negligence of Navy air traffic controllers working in Antarctica caused the wrongful deaths.  <u>Id.</u>  The Federal Tort Claims Act allowed venue only where plaintiffs reside or where the act or omission complained of occurred.  <u>Id.</u> at 100.  Since none of the plaintiffs lived in the United States, and the negligence of the Navy air traffic controllers occurred in Antarctica, venue for that claim for relief was improper.  <u>Id.</u>  In determining whether proper venue for the negligence claim against the Navy officers in the District of Columbia supported venue for the improperly venued claims, the <u>Beattie</u> Court considered whether the plaintiffs sought damages for "an essentially single wrong," whether the parties and proof were identical or very similar, and whether witnesses and evidence were common.  <u>Beattie</u>, 756 F.2d at 101.  Finding those factors satisfied, the court held that venue for the District of Columbia claims established venue for the Antarctica claims.  <u>Id.</u>

CBD's Second and Third Claims support the same conclusion.  Both claims seek redress for a single wrong, that is, Defendants' failure to terminate, revoke, issue or deny the Title V permit for TVA Paradise.  The parties and proof are identical, and any witnesses and evidence are the same for each claim.  Therefore, proper venue for the Second Claim for Relief supports venue for the Third Claim for Relief.

**D.**    **The Doctrine Of Pendent Venue Is Applicable To The Third And Fourth Claims For Relief.**

Though the most important consideration in a decision to exercise pendent venue is the existence of a common nucleus of operative facts, other factors include convenience, avoidance of piecemeal litigation, fairness, and the convenience of the court.  As explained below, all of the claims asserted by CBD arise from a common nucleus of operative fact, and all prudential considerations favor this Court's exercise of pendent venue.

**1.**    **CBD's Claims Arise From A Common Nucleus Of Operative Facts**

CBD's Third Claim for Relief challenges Defendants' unreasonable delay in modifying, terminating, revoking, issuing or denying the Title V permit for TVA Paradise.  The claim is presented in the alternative to the Second Claim for Relief, a mandatory duty claim challenging the same conduct and seeking the same remedy. EPA acknowledges that these two claims "seek to compel precisely the same conduct."  EPA Brief, p. 12.  Thus, any argument that the two claims do not arise from a common nucleus of operative facts is totally without merit, as the only difference in the claims is the law CBD seeks to have the Court apply to those operative facts.

CBD's Fourth Claim for Relief also arises from that same nucleus of operative fact.  The operative facts are: (1) Kentucky purported to issue TVA Paradise a Title V permit that did not authorize the use of any credible evidence to establish compliance, or non-compliance, with the permit; (2) Kentucky basis for not including the Credible Evidence Rule into the TVA Paradise Title V permit is the fact that the Kentucky SIP does not yet contain the Credible Evidence Rule, See Exhibit 2 at 11, response to comment 12; (3) CBD petitioned for an objection to the TVA Paradise Title V permit on seven grounds, including the failure to include a provision stating that anyone can use of any credible evidence to establish compliance or noncompliance; (4) included in CBD's Title V petition was a request in the alternative and pursuant to the APA that EPA

issue a SIP Call to Kentucky to correct that deficiency in its SIP to add the Credible Evidence

Rule; (5) EPA has never responded to CBD's Title V and APA petition even though it has been a

year and a half.  All of CBD's four claims for relief arose from this nucleus of facts, including

CBD's Fourth Claim for Relief.  Therefore, the Third and Fourth Claims for relief satisfy the

most important factor in determining whether to apply pendent venue.

> ### 2.    Exercise Of Pendent Venue Is More Convenient, Avoids Piecemeal Litigation, and Promotes Fairness To The Litigants.

Adjudication in this District is more convenient for all parties, their counsel, and any

witnesses, and any necessary evidence is likely located in this District. Plaintiffs are pursing their

claims in this action in the public interest and though they are committed to seeking redress for

the injuries they have suffered from Defendants' conduct, they have limited resources to dedicate

to this action.  Plaintiff CBD is a national non-profit corporation with offices in Washington,

D.C., Arizona, Oregon, New Mexico and California. Plaintiff Preston Forsythe is the only party

who resides in the Western District of Kentucky. Undersigned counsel for Plaintiffs is admitted

to practice before this Court, where he practices more cases than in any other court.  Plaintiffs'

counsel is not admitted to practice before the Western District of Kentucky.

Most importantly, Plaintiffs sent EPA their notice of intent to sue on these claims over six

months ago.  EPA took no external action on the permit until October 5, 2006, over two months

after Plaintiffs filed their Complaint. Even then, EPA's action does not dispose of Plaintiffs'

claims, only requesting that TVA submit an application for a federally issued Title V permit.

This action challenges Defendants' failure to satisfy mandatory deadlines and unreasonable

delay.  EPA's Motion to Dismiss simply presents another opportunity for agency delay while the

pollution from TVA Paradise continues to cause death, disease and harm to the ecosystem. Therefore, adjudication of the issues presented in the complaint, now, in this District is just.

Defendant Stephen Johnson resides in the District of Columbia. Defendant EPA resides in the District of Columbia, and has no office in Kentucky that deals with Title V air permitting or the Kentucky SIP. The Department of Justice, counsel for Defendants, and the specific counsel filing appearances in this case maintain offices and practice in the District of Columbia. As described above, the Clean Air Act does not permit the Administrator to delegate his duty to respond to Plaintiffs' Title V petition. Thus any evidence or necessary witnesses are likely located in his office, or the office of EPA's general counsel in this District. Moreover, the only other EPA offices arguably relevant to Plaintiffs' claims is the Region 4 office in Atlanta, Georgia and the Office of Air Quality Planning and Standards in North Carolina. Defendants do not request transfer to either of those Districts, however. Such a transfer would be inconvenient for Plaintiffs. No EPA staff or records relevant to this case are maintained by EPA in Kentucky. Therefore, adjudication in this District would be more convenient.

This Court is unquestionably the proper venue for half of CBD's action, as EPA acknowledges. EPA Brief, p. 12. Resolution of all of CBD's claims now, in this District, avoids piecemeal litigation of those claims for which EPA challenges venue. Exercise of pendent venue in this case is also fair to all parties, and EPA has presented no argument that adjudication in this forum would be unfair. Therefore, CBD has satisfied all prerequisites for the application of pendent venue to the Third and Fourth Claims for relief, and this Court should exercise its broad discretion to allow CBD's claims to go forward.

### III.    CBD'S CLAIMS SHOULD NOT BE TRANSFERRED TO THE WESTERN DISTRICT OF KENTUCKY.

Assuming *arguendo* that the Court declines to apply the single cause of action theory or exercise pendent venue, the interests of justice support transfer to the Eastern District of Kentucky where Plaintiffs' counsel maintains his office and is admitted to practice. EPA concedes that any district court within the Sixth Circuit is "potentially proper" venue under 42 U.S.C. § 7604(a). If Plaintiffs were to re-file this case, they would do so in the Eastern District of Kentucky because litigation in the Western District of Kentucky would be exceedingly inconvenient, no Defendants are located in the Western District of Kentucky, and none of the events or omissions giving rise to Plaintiffs claims occurred in the Western District of Kentucky. All of the events occurred either in the District of Columbia, the Northern District of Georgia, or in North Carolina, all of the Defendants reside in the District of Columbia, and the Credible Evidence Rule, if eventually promulgated in response to a SIP call issued by EPA headquarters or EPA Region 4 in Atlanta, would have statewide applicability. In short, there is no proper reason for the case to be venued in the Western District of Kentucky.

Defendants have only offered one "morsel" to support transfer of this case to the Western District of Kentucky - the allegation that this case involves such localized issues that the Western District of Kentucky is the appropriate venue. EPA Brief, p. 13. This case is unlike those cited by Defendants for the proposition that local disputes should be resolved locally, however, as those cases involved genuinely local projects and effects, while CBD's claims involve the regulation of air pollution, the impact of which is not limited to the local or statewide area. See e.g. National Wildlife Fed'n v. Harvey, 437 F. Supp. 2d 42, 49-50 (D.D.C. 2006)(transfer to Southern District of Florida in the interest of justice because challenged decision was made in southern Florida, affected a species located only in southern Florida, and affected navigation,

flood control, agriculture and municipal water supplies in southern Florida); Hawksbill Sea Turtle v. FEMA, 939 F. Supp. 1, 3 (D.D.C. 1996)(transfer appropriate because challenged project, threatened habitat, and all alleged violations of law occurred in Virgin Islands).

Unlike the cases cited by EPA, CBD's challenges do not involve projects with direct effects only in the local area. As described above, the pollution from TVA Paradise travels great distances and is deposited in waterways that flow through other states and countries, contributing to death, disease and harm to ecosystems in locations remote from the local area. See 70 Fed. Reg. 25162, 25168-69(Clean Air Interstate Rule addresses interstate transport of particulate matter and ozone); 70 Fed. Reg. 8888-89 (Feb. 23, 2005)(one form of NOx, nitrous oxide, is a greenhouse gas, which has worldwide impacts).

Because EPA concedes that venue is proper in any court in the Sixth Circuit is "potentially proper," the incorporation of a Credible Evidence Rule in the Kentucky SIP will have statewide effect, and the issues presented are not local to the Western District of Kentucky, transfer to the Eastern District of Kentucky would better serve the interests of justice if the Court declines to apply the single cause of action theory or exercise pendent venue.

## CONCLUSION

WHEREFORE, for the reasons set forth above, Defendants' Motion should be denied in its entirety.

Respectfully submitted,

____s/Robert Ukeiley_____
Robert Ukeiley (MD14062)
Law Office of Robert Ukeiley
433 Chestnut Street
Berea, KY 40403

Tel: (859) 986-5402
Fax: (859) 986-1299
E-mail: rukeiley@igc.org

Counsel for Plaintiffs

DATED:  October 23, 2006