IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL      )
DIVISION *et al.*,              )
                               )
        Plaintiffs,       )
                               )
        vs.           )  Civil Action NO. 06-CV-1350 (GK)
                               )  [No Pending Deadlines]
STEPHEN L. JOHNSON *et al.*,   )
                               )
        Defendants.    )
                               )
                               )

## PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS, AND MEMORANDUM IN SUPPORT

      Pursuant to the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604(d), Plaintiffs

Center for Biological Diversity, Preston Forsythe and Hilary Lambert (collectively "CBD" or

"Plaintiffs") request attorneys' fees and costs for this deadline suit regarding the permitting of a

massive source of air pollution.  The instant action resulted in a settlement, which provided

Plaintiffs with the relief they requested.  Plaintiffs now request their attorneys' fees and costs.

## I.     INTRODUCTION

      Plaintiffs are entitled to recover their attorneys' fees and costs in this case.  However,

Plaintiffs and Defendants Stephen L. Johnson, Administrator, and the United States

Environmental Protection Agency (collectively "EPA") were not able to come to agreement on

the appropriate hourly rate for fee recovery for Plaintiffs' attorneys, nor on the reasonable

number of billable hours expended by Plaintiffs' attorneys.  Thus, it is appropriate for the Court

to resolve the issue of fees at this time, specifically (a) the appropriate hourly rate and (b) the

reasonable number of hours.

## II.    SUMMARY OF ARGUMENT

Fee-shifting is key to strong environmental enforcement.  The purpose of private attorney general fee-shifting statutes like the Clean Air Act's is to encourage competent, skilled attorneys to take on Clean Air Act cases and in doing so, enforce the Clean Air Act, which is "Congress's response to well-documented scientific and social concerns about the quality of the air that sustains life on earth and protects it from… degradation and pollution caused by modern industrial society."  Delaware Valley Citizens Council for Clean Air v. Davis, 932 F.2d 256, 260 (3rd Cir. 1991).  To accomplish that purpose, attorneys who win such cases must be paid for all of their reasonable efforts at the same level as their counterparts in the commercial market. See Hensley v. Eckerhart, 461 U.S. 424, 430 n.4 (1983); Blum v. Stenson, 465 U.S. 886, 893-94 (1984). Without the promise of a fully compensatory fee award, competent, skilled attorneys are less likely to take these cases and enforcement of this critical public health and welfare statute will be diminished.

In the instant case, Plaintiffs seek $48,633 for attorney time and $453.07 in costs. EPA's counsel has indicated that EPA does not dispute the $453.07 in costs.

EPA's principle objection to full fee recovery seems to be that because one of Plaintiffs' attorneys, Robert Ukeiley, lives in Kentucky, he and his associates should not be compensated at the forum hourly rate derived from the U.S. Department of Justice's ("DOJ") own "Laffey" Matrix for reasonable rates in the District of Columbia, which is less than actual reasonable market rate for D.C.  EPA's argument represents a sudden and unexplained reversal of DOJ's approach in cases in which Ukeiley is counsel of not objecting to DOJ Laffey Matrix rates, even when other elements of the fee awards are contested by the federal agency defendants.  See e.g. CBD v. Norton, 04-0156-JDB (D.D.C. 2005) Jan. 26, 2005 Order at 5, ftnt. 3 (DOJ does not

object to use of DOJ Laffey Matrix rates for Ukeiley) attached as Ex. 3 to Declaration of Robert

Ukeiley in Support of Plaintiffs' Motion for Attorneys' Fees and Costs ("Ukeiley Decl.").

 EPA's argument will apparently be based on a misguided attempt to apply the facts of

this case to <u>Davis County Solid Waste Mgmt. v. EPA</u>, 169 F.3d 755, 758 (D.C. Cir. 1999).

<u>Davis</u> does not apply to this case because in those instances where Ukeiley actually charges

market rates, he charges and is paid rates that are close to or mirror the DOJ Laffey Matrix rates.

Furthermore, in this case, CBD did not pay Plaintiffs' attorneys for their time working on this

case.  Rather, Plaintiffs' attorneys represented CBD on a *pro bono* basis so attorneys' fees

recovered will go to Plaintiffs' attorneys to pay them for their work rather than to Plaintiffs to

reimburse them for money previously paid Plaintiffs' attorneys.  Therefore, <u>Davis</u>, which was

about a client receiving a windfall because it paid its Salt Lake City-based lawyers substantially

less than the going D.C. rates but then requested to be reimbursed at D.C. rates, has no

applicability here.

 EPA's argument, which finds no basis in <u>Davis</u> or any other case, is essentially an

argument to abolish the well-established rule that the hourly rate to apply in fee shifting cases is

the reasonable hourly rate in the forum where the case is being heard when public interest

lawyers who live outside of D.C. represent clients on a *pro bono* basis.

 EPA may also argue that Ukeiley should be penalized because he represented the

Plaintiffs in this case on a *pro bono* basis and that his public interest environmental law practice

does the majority of its work on a *pro bono* basis.  The D.C. Circuit and other courts have

soundly rejected this anti-public interest argument, which if adopted would undercut the very

purpose of the federal fee-shifting statutes.

 Furthermore, EPA may object to D.C. rates, arguing that the District Court for the

District of Columbia was not the proper venue and the case would have been dismissed for improper venue or transferred to the Western District of Kentucky had this case been fully litigated.  Plaintiffs will provide a little context to help explain this issue.  This case involved three main claims for relief and one alternative claim for relief.  The first claim for relief was based on EPA's violation of its mandatory duty to respond within 60 days to Plaintiffs' petition requesting that EPA object to the proposed Tennessee Valley Authority's ("TVA") Paradise coal-fired power plant Clean Air Act Title V Permit, as mandated by 42 U.S.C. § 7661d(b)(2).  The second claim for relief was based on EPA's violation of its mandatory duty under 42 U.S.C. § 7661(b)(3) and (c) and 40 C.F.R. § 71.4(e) to modify, terminate, or revoke, or issue or deny, the proposed TVA Paradise Title V permit.  The third claim, which as an alternative to the second claim, was that EPA was unreasonably delaying its duty under 42 U.S.C. § 7661(b)(3) and (c) and 40 C.F.R. § 71.4(e) to modify, terminate, or revoke, or issue or deny, the proposed TVA Paradise Title V permit. The fourth claim was EPA was unreasonably delayed in responding to the Plaintiffs' petition for rulemaking requesting, pursuant to 5 U.S.C. 553(a), that EPA promulgate a rule to amend the Kentucky State Implementation Plan to fully incorporate the "credible evidence rule."  The credible evidence rule is an important tool that would help citizens to bring enforcement actions against major sources of air pollution such as TVA Paradise.

Despite its straightforward duties under the Clean Air Act, EPA had not responded to CBD's petition for an objection to the Title V permit proposed by Kentucky in 2004 or to issue a federal permit based on its own objections to that permit.  Nor had EPA required compliance with its instruction, issued as early as 1994, to amend the Kentucky State Implementation Plan to comply with the federal "Credible Evidence Rule." Plaintiffs' filed their Complaint in this case

and subsequently obtained all of the relief they desired in this deadline suit through a settlement agreement.

Although this Court did not rule on Defendants' Motion to Dismiss for Improper Venue, or in the Alternative to Transfer (hereafter "Defendants' Motion"), D.C. was the proper venue for litigation of Plaintiffs' claims. EPA does not have a serious argument that two of the four causes of action are properly venued in this Court as they are mandatory duty claims against the EPA Administrator which logically and legally belong in this Court.  There was an alternative unreasonable delay claim but the Court never would have had to reach that claim as the primary claim was meritorious.  As to the fourth claim, it is just as likely that that claim should have been decided in this court as in any other court.  EPA can only base its improper venue claim on speculation.  Therefore, D.C. rates are properly used to determine the attorneys' fees in this case.

Finally, EPA will likely argue that the time Plaintiffs' attorneys spent litigating the Defendants' Motion should not be recoverable.  However, time spent opposing a motion that is ultimately not resolved because the case settled is reasonable and thus recoverable.  In any event, as explained in the preceding paragraph, Plaintiffs should have prevailed in their opposition to EPA's Motion.

### III.    LEGAL BACKGROUND

#### A.    The Clean Air Act

The basic structure of the Clean Air Act came into being in 1970 in response to air pollution's urgent threats to public health.  General Motors Corp. v. United States, 496 U.S. 530, 533 (1990).  The House committee reviewing the Clean Air Act in 1970 expressed support for the legislation, stating in its report that "the purpose of the [Act]...is to *speed up*, expand, and intensify the war against air pollution in the United States with a view to assuring the air we

breathe throughout the Nation is wholesome once again." Clean Air Amendments of 1970, Pub. L. No. 91-604, 84 Stat.1676 (emphasis added).  Under this structure, the federal government is to set national ambient air quality standards ("NAAQS") and then states are to create State Implementation Plans ("SIPs") to maintain and attain the NAAQS.  See Sierra Club v. EPA, 294 F.3d 155, 158 (D.C. Cir. 2002).

Congress passed two major amendments to the Clean Air Act incorporating new programs aimed at achieving this goal; provisions to prevent the significant deterioration of areas in attainment of the ambient air quality standards in 1977, and a federal "Title V" operating permit program in 1990.  Pub. L. No. 95-95, 91 Stat. 685 (1977); Pub. L. No.101-549, § 501, 104 Stat. 2399, 2635 (1990).  Three major provisions of the Clean Air Act are relevant to this action: State Implementation Plans; Prevention of Significant Deterioration; and Title V Operating Permits.

### B.    State Implementation Plans

The major components of the Clean Air Act's cooperative federalism scheme are the State Implementation Plans or "SIPs," which must contain enforceable regulations to achieve and maintain the National Ambient Air Quality Standards ("NAAQS") set by EPA.  42 U.S.C. § 7410.  The SIPs must be at least as stringent as the federal laws, though they can be more stringent. See 42 U.S.C. § 7410(a).

Although SIPs are implemented by the states, states must submit their proposed SIPs to EPA.  If the proposed SIP satisfies the requirements of the Clean Air Act, EPA promulgates the SIP through federal notice and comment rule making and the SIP becomes federally enforceable. 42 U.S.C. §§ 7410(a), 7604(a)(1).  If a State fails to submit a SIP that meets the requirements of the Clean Air Act, EPA must itself promulgate a Federal Implementation Plan ("FIP") for that

State.  42 U.S.C. § 7410(c)(1).

The Clean Air Act also authorizes EPA to initiate rulemaking proceedings and call for a SIP revision when the SIP is inadequate or fails to meet the requirements of the Clean Air Act ("SIP Call").  See 42 U.S.C. § 7410(k)(5).  According to EPA, "[i]f EPA makes such a finding it *must* require the state to submit, within a specified period, a SIP revision to correct the inadequacy."  63 Fed. Reg. 57356, 57360 (Oct. 27, 1998)(emphasis added).  Once EPA issues a SIP Call, the Administer may establish "reasonable deadlines" for the submission of plan revisions, but those deadlines are "not to exceed 18 months" after the SIP Call.  42 U.S.C. § 7410(k)(5).

### C.    Prevention Of Significant Deterioration

The Clean Air Act's Prevention of Significant Deterioration ("PSD") provisions include a permit program for major new sources of air pollution or major modifications to existing major sources of air pollution in areas that are in attainment of the national ambient air quality standards. 42 U.S.C. § 7475; see also U.S. v. Ohio Edison Co., 276 F. Supp. 2d 829, 832 (S.D. Ohio 2003).

The exemption from PSD applicability for existing sources, often referred to as "grandfathering," was not intended to grant permanent immunity for all sources built before 1977.  See Ohio Edison, 276 F. Supp. 2d at 850; Wisconsin Elec. Power Co. v. Reilly, 893 F. 2d 901, 909 (7th Cir. 1990).  Although the PSD program has applied to existing sources of air pollution making major modifications for the last 30 years, EPA did little to enforce these provisions until 1999.  As a result, old, dirty coal-fired power plants have been repeatedly modified to extend their lives well beyond what could have been envisioned in 1977, all the while avoiding the PSD provisions that would force them to lower the amount of pollution they

emit by installing and operating modern pollution control equipment or other methods.  See e.g.
Ohio Edison, 276 F.Supp. 2d at 839-40.  TVA Paradise is one such facility, as described below.

> **D.** **The Title V Program**

Congress amended the Clean Air Act in 1990 to include a federal operating permit
program in Title V of the Act.  Pub. L. No. 101-549, 104 Stat. 2399 (1990) (codified as amended
at 42 U.S.C. § 7661 (1990)).  A Title V permit can be thought of as a "source specific bible" for
Clean Air Act compliance.  Virginia v. Browner, 80 F.3d 869, 873 (4th Cir.1996).  These
permits, though issued by the states, are known as federal operating permits because they are
designed to "assure compliance" with all the requirements stemming from the federal Clean Air
Act that apply to a pollution source.  42 U.S.C. § 7661c(a).

A primary purpose of the Title V permitting program is to reduce violations of the Clean
Air Act and improve enforcement by recording in one document all of the air pollution control
requirements that apply to a major source of air pollution. See New York Public Interest
Research Group v. Whitman, 321 F.3d 316, 320 (2d Cir. 2003).   Major sources of air pollution
cannot legally discharge pollutants into the air unless they have a valid Title V operating permit.
42 U.S.C. § 7661a(a).

Congress established the right of citizens to participate in each of the critical phases of
the Title V permit process to defend their health, natural heritage, and other interests against air
pollution.  Thus, members of the public have the opportunity to comment on draft Title V
permits, to petition EPA to object to a State proposed permit, to require EPA to respond to their
petitions within 60 days, and to challenge EPA's failure to object in federal court.   42 U.S.C. §
7661d(b)(2).

More specifically, before a Title V permit can be issued by a State, the State must

forward the proposed Title V permit to EPA.  42 U.S.C. § 7661d(a)(1)(B).  EPA then has 45

days in which it can review the proposed permit.  EPA must object to the issuance of the permit

if EPA finds that the permit does not comply with all applicable provisions of the Clean Air Act.

42 U.S.C. § 7661d(b)(1).  After EPA's 45-day review period, "any person may petition the

Administrator within 60 days" to object to the Title V permit. 42 U.S.C. § 7661d(b)(2).  Once it

receives a petition for objection to a Title V permit, EPA must grant or deny that petition within

60 days. Id.; New York Public Interest Research Group v. Whitman, 214 F. Supp. 2d 1, 2

(D.D.C. 2002).

　　　EPA's record of compliance with the mandatory 60-day deadline in 42 U.S.C. §

7661d(b)(2) is abysmal.  In almost every single case, EPA does not respond to a Title V petition

until after a citizen suit has been filed to force compliance with this mandatory duty.  See

Ukeiley Decl. at ¶ 54.  EPA fails to respond to citizen Title V petitions within the mandatory 60

day time period knowing that plaintiffs almost always recover their fees in deadline suits.

　　　**E.　　Credible Evidence Rule**

　　　EPA promulgated the Credible Evidence Rule to clarify that compliance, or non-

compliance, with the Clean Air Act and its regulations by a source of air pollution can be

established using any credible evidence. 62 Fed. Reg. 8314 (Feb. 24, 1997).  EPA issued "SIP

calls" to various states as early as 1994 requiring them to submit revised State Implementation

Plans incorporating the Credible Evidence Rule.  Id. at 8327; See Clean Air Implementation

Project v. Envt'l Protection Agency, 150 F.3d 1200, 1207 (D.C. Cir. 1998).  Unfortunately, EPA

never completed this SIP call, so Kentucky and many other states have not amended their State

Implementation Plans to explicitly  incorporate the Credible Evidence Rule.  Lack of perfect

clarity when it comes to the credible evidence rule has lead to extensive litigation on this issue

when citizens are trying to enforce substantive provisions of the Clean Air Act.


## IV.     FACTUAL AND PROCEDURAL BACKGROUND

The Tennessee Valley Authority's ("TVA") Paradise Station is a massive, old, coal-fired power plant located on the Green River in Muhlenberg County, Kentucky.  TVA began operating Paradise in 1963.  TVA Paradise burns over seven million tons of coal each year, and is one of the largest sources of air pollution in the nation.  In 2005, TVA Paradise emitted well over 100,000 tons of pollution into the air.  Nevertheless, TVA never received a valid Clean Air Act Title V permit to operate TVA Paradise Station, even though Title V was passed in 1990, until after the parties settled this deadline suit.

### A.     The Effects Of Pollution From TVA Paradise

TVA Paradise emits pollution, which, according to EPA, leads to mortality and morbidity.  That pollution does not rest idly in the atmosphere over western Kentucky.  Power plant pollution travels great distances and reacts in the atmosphere to form a variety of harmful compounds, the effects of which are experienced in downwind states and distant water bodies. For example, EPA has acknowledged that the pollution from Ohio power plants contribute to acid rain in areas as far away as New England and Eastern Canada. Ohio Power Co v. US EPA, 729 F.2d 1096, 1097 (6th Cir. 1984).

TVA Paradise emits sulfur dioxide ("$SO_2$").  In Ohio Power, the Sixth Circuit observed that "there is now no longer any doubt that high levels of pollution sustained for periods of days can kill," and that long-term exposure to $SO_2$ produces significant health effects, including "[a]cute respiratory infections in children, chronic respiratory diseases in adults, and decreased levels of ventilatory lung function in both children and adults."  Ohio Power, 729 F.2d at 1098.

$SO_2$ also reacts with oxygen and other substances in the atmosphere to form sulfate aerosols and sulfuric acid mist, which are dangerous to human health and can remain airborne for days and affect areas far downwind.  Id.   Sulfuric acid also contributes to impaired visibility.  $SO_2$ emissions from coal-fired power plants also contribute to acid rain, which damages building materials and has deleterious impacts on plants and fish.  U.S. EPA, *Latest Findings on National Air Quality, 2002 Status and Trends Summary* 12 (2002) available at <http:www.epa.gov/air/airtrends/aqtrnd02/2002_airtrends_final.pdf> (hereinafter "2002 Air Trends").

TVA Paradise also emits large quantities of nitrogen oxides (NOx), which causes asthma attacks, respiratory tract symptoms, bronchitis, and decreased lung function.  Committee on Environmental Health, American Academy of Pediatrics, "Ambient Air Pollution: Health Hazards to Children," Pediatrics 2004: 114: 1699-1707, at 1701.  NOx emissions directly result in nitrogen deposition in aquatic and terrestrial ecosystems.  See 70 Fed. Reg. 8892 (Feb. 23, 2005).  Elevated soil nitrogen levels exacerbate the effects of acid deposition.  Id. at 8893.  Elevated nitrogen levels in water contribute to eutrophication, which depletes dissolved oxygen and can lead to "dead zones" in water bodies.  EPA has stated that "airborne releases of NOx are the largest source of nitrogen pollution in certain water bodies, such as the Chesapeake Bay."  2002 Air Trends, p. 2, 6.

NOx emissions from coal-fired power plants also contribute to the formation of ground level ozone.  Ozone is the main ingredient in smog.  According to EPA, short-term ozone exposure "can irritate the respiratory system, causing coughing, throat irritation, and chest pain ... reduce lung function and make it more difficult to breathe deeply."  70 Fed. Reg. 25162, 25169 (May 12, 2005).   Exposure to ambient ozone also exacerbates asthma, causing increased

asthma attacks, and increases hospital admissions and emergency room visits due to respiratory problems.  Id.  Sadly, active children are one of the groups at the highest risk from ozone exposure.  Id.  Courts have recognized that ozone is very harmful to human health.  See e.g. 1000 Friends of Maryland v. Browner, 265 F.3d 216, 220, n.2 (4th Cir. 2001).  Ozone also causes damage to vegetation and wildlife.  70 Fed. Reg. 25162, 25169.  EPA acknowledges that ozone and its precursor pollutants can travel hundreds of miles from their sources.  2002 Air Trends, p. 8.  Sources in Kentucky contributed to non-attainment of the ozone National Ambient Air Quality Standards in Ohio, Michigan, and Georgia.  70 Fed. Reg. 25162, 25249 Table VI-9.

SOx and NOx emissions are precursor chemicals to fine particulate matter.[1]  70 Fed. Reg. 25162, 25162.  Fine particulate matter causes a variety of adverse health effects, including premature death, heart attacks, strokes, birth defects, and asthma attacks. 71 Fed. Reg. 2620 (Jan. 17, 2006).  In the most recent review of the fine particulate matter, EPA was unable to discern a threshold level of pollution under which the death and disease associated with particulate matter would not occur.  Id. at 2635.  Put simply, the more fine particulate matter TVA Paradise and other sources emit, the more death and disease.

### B.    Prevention Of Significant Deterioration Enforcement At TVA Paradise

EPA's execution of the Prevention of Significant Deterioration program represents an "abysmal breakdown in the administrative process."  Ohio Edison, 276 F. Supp. 2d at 832.  After over thirty years of relative inaction, in 1999 DOJ filed multiple lawsuits in 10 states alleging violations of the Prevention of Significant Deterioration and related programs regarding major modifications of existing sources.  In addition, EPA issued a Compliance Order to TVA rather than a lawsuit for its violations of the Clean Air Act, including the Prevention of Significant

---

[1] Fine particulate matter is solid or aerosol particles with an aerometric diameter of less than 2.5 microns and is referred to in Clean Air Act jargon as PM2.5

Deterioration, at nine of its coal-fired power plants.  In re Tennessee Valley Authority, CAA

2000-04-008, 9 E.A.D. 357, 367 (Sept. 15, 2000), rev'd, Tennessee Valley Authority v.

Whitman, 336 F.3d 1236 (11th Cir. 2003).[2]

 EPA "found that TVA violated the Clean Air Act when it made certain physical changes

to fourteen of the boiler units at nine of its power plants without having first obtained permits

under the Clean Air Act authorizing TVA to commence construction or modification of the

plants."  Id. at 367.  TVA Paradise was one of those plants.  Id. at 365.  The Environmental

Appeals Board sitting in Washington, D.C. upheld the EPA's determination that TVA violated

the Prevention of Significant Deterioration permitting requirements at Paradise units 1, 2 and 3

with regard to NOx.  Id. at 382.  The Environmental Appeals Board found that in 1984, as part of

an extensive effort to extend the useful lives of its coal-fired power plants, TVA embarked on a

series of significant improvement projects at TVA Paradise.  Id. at 398.  These projects increased

actual NOx emissions in the two years following the projects by 12,102 tons per year. Id. at 443.

The Environmental Appeals Board concluded that these projects, despite TVA's efforts to

obfuscate the true purpose, constituted major modifications for which Prevention of Significant

Deterioration requirements should have been met.  Id. at 478.

 The Eleventh Circuit Court of Appeals, not the Sixth Circuit, reversed the Environmental

Appeals Board's decision in Tennessee Valley Authority. v. Whitman, 336 F.3d 1236 (11th Cir.

2003).  Two judges on the three judge panel filed a concurrence, thus the court's opinion is that

of one judge.  The court held that it lacked jurisdiction to review the administrative compliance

---

[2] EPA could have filed an enforcement action in the United States District Court for the Western District of Kentucky but instead chose to pursue its enforcement action in Washington, D.C. in front of the Environmental Appeals Board.  The appeal of this enforcement action was heard in the 11th rather than the 6th circuit.

order issued to TVA because it was not a final agency action.  Id. at 1240.  The court based its

decision on its conclusion that the provision of the Clean Air Act that allows EPA to issue

administrative compliance orders that have the status of law is "unconstitutional to the extent that

severe civil and criminal penalties can be imposed for noncompliance with the terms of an

[administrative compliance order]." Id.  The court instructed EPA that until it proves the new

source review violations in district court, TVA is free to ignore EPA's enforcement efforts.

Id.  The court did not review the substance of the underlying allegations and did not find that

TVA had not violated the Clean Air Act.  Instead of pursuing TVA's violations of the Clean Air

Act through a judicial enforcement action, however, EPA did nothing.  EPA's inaction is

disturbing in the face of the agency's own evidence that pollution from TVA Paradise is illegal

and contributes to the death, disease, and widespread ecosystem damage.

**C.     TVA Paradise's Title V Permit**

Although Title V was passed in the 1990 Clean Air Act Amendments, it was not until

February 7, 1997, that TVA applied for its first Title V permit.  Over six years later, on August

18, 2004, the Kentucky Division for Air Quality ("DAQ") finally issued a draft Title V permit

for TVA Paradise.  Of note, the Clean Air Act mandates that a state issue all initial Title V

permits within three years.  42 U.S.C. § 7661b(c).

On September 14, 2004, CBD submitted comments to the Kentucky DAQ on the TVA

Paradise draft permit.  The TVA Paradise draft permit did not include the Prevention of

Significant Deterioration provisions, such as compliance with Best Available Control

Technology emission limits.  CBD pointed out this deficiency, among others, in its comments,

citing evidence that EPA submitted to the Environmental Appeals Board.

Kentucky DAQ issued what it labeled as the "final permit" on December 29, 2004.  This

permit, like the draft, did not include the Prevention of Significant Deterioration requirements, despite CBD's comments.  On January 7, 2005, Kentucky DAQ proposed the permit to EPA, labeled a "proposed permit," in an effort to comply with 40 C.F.R. § 70.7(a)(v) and state regulations.

EPA objected to TVA Paradise permit on February 18, 2005, via a letter from EPA's Beverly Banister in EPA Region 4 in Atlanta, Georgia.  EPA's objection rested on two grounds: (1) that a heat input limit contained in a State Operating Permit that was incorporated into the Kentucky SIP was not included in the TVA Paradise Title V permit; and (2) that the permit did not include adequate monitoring for the two lime storage silos and handling system.  CBD had not included the heat input limit issue in its petition for an objection.

EPA did not publicly disclose its February 18, 2005 objection, and did not provide notice of the objection to Plaintiffs.  EPA did not even place its objection letter on its webpage, where EPA had placed its other objection letters.   EPA's objection did not address the Prevention of Significant Deterioration issue identified by CBD, and it did not address six other substantive grounds for an objection that CBD presented in its comments.

On April 21, 2005, CBD filed a petition requesting that EPA object to the proposed TVA Paradise Title V Permit. Specifically, CBD's petition requested, pursuant to 42 U.S.C. § 7661d(b)(2), that EPA object to the permit based on the same substantive grounds that CBD presented in its comments to Kentucky DAQ, including the applicability of Prevention of Significant Deterioration to TVA Paradise units 1, 2 and 3.

**D.    The Kentucky SIP And The Credible Evidence Rule**

CBD's petition also sought an objection to the TVA Paradise Title V permit based on the fact that it did not contain language explicitly implementing the Credible Evidence Rule.  CBD

stated in its petition, however, that if EPA determined that Kentucky's SIP was at fault for not fully including language explicitly implementing the Credible Evidence Rule, then EPA should consider CBD's petition as an Administrative Procedures Act ("APA") petition for EPA to promulgate a rule to correct the Kentucky SIP by explicitly including the Credible Evidence Rule.

> **D.    The Instant Action**

The Clean Air Act requires EPA to respond to all petitions under 42 U.S.C. § 7661d(b)(2) within 60 days.  Id.  Thus, EPA was required to respond to CBD's petition by June 20, 2005. EPA did not respond within the mandatory 60-day deadline, thus commencing EPA's unlawful failure to perform its mandatory duty in this case.

After further delays by EPA, Plaintiffs commenced this citizen suit on July 31, 2006. Plaintiffs' Complaint included four Claims for Relief: (1) EPA is in violation of a mandatory duty under 42 U.S.C. 7661d(b)(2) to respond within 60 days to Plaintiffs' Title V petition requesting that EPA object to the proposed TVA Paradise Title V Permit; (2) EPA is in violation of a mandatory duty under 42 USC 7661(b)(3) and (c) and 40 CFR 71.4(e) to modify, terminate or revoke, or issue or deny, the proposed TVA Paradise Title V Permit because EPA had objected to the Title V permit and KY DAQ had not remedied EPA's objections; (3) alternatively, EPA has unreasonably delayed modifying, terminating, or revoking, or issuing or denying, the Kentucky TVA Paradise Title V Permit; and (4) EPA has unreasonably delayed responding to Plaintiffs' petition for rulemaking requesting, pursuant to 5 U.S.C. § 553(a), that EPA promulgate a rule to amend the Kentucky State Implementation Plan to explicitly incorporate the credible evidence rule.

Following Plaintiffs' Complaint, Kentucky DAQ withdrew the proposed TVA Paradise

Title V Permit on August 18, 2006.   In a letter dated October 5, 2006, which Plaintiffs only

discovered on October 19, 2006, through a public records request, EPA initiated a Part 71 permit

process to issue or deny a Title V Permit for the TVA Paradise Plant.  In that letter, EPA's

Beverly Banister in Atlanta, Georgia informed TVA Janet Watts in Chattanooga, Tennessee that

TVA must apply for a federally issued Title V permit within nine months.

Finally, on October 20, 2006, 482 days after the 60 day deadline, EPA took action on

Plaintiffs' Title V petition requesting that EPA object to the proposed TVA Paradise Title V

Permit.  However, EPA did not take action at that time on Plaintiffs' petition for rulemaking.

EPA published notice of its action denying Plaintiffs' Title V Petition in the Federal Register on

December 14, 2006.

Meanwhile, on October 10, 2006, Defendants filed a Motion to Dismiss for Improper

Venue, or, in the Alternative, to Transfer ("Defendant's Motion to Dismiss").  However, as

explained in Plaintiffs' Memorandum in Opposition to EPA's Motion to Dismiss ("Plaintiffs'

Response"), venue was proper and Defendants' Motion should have been denied.  Dismissal or

transfer of this case to an inconvenient forum with no practical connection to this case would

have caused unnecessary delay and added expense and hardship to the public interest Plaintiffs

and their *pro bono* counsel.  This district was the appropriate venue for all claims, as most of the

events or omissions giving rise to those claims occurred here.  However, on February 14, 2007,

before this Court ruled on Defendant's Motion to Dismiss, the parties reached a settlement in this

case.

The Settlement Agreement provides that by May 25, 2007, EPA shall take final action to

grant or deny Plaintiffs' April 2005 petition requesting that EPA promulgate a rule to amend the

Kentucky State Implementation Plan to fully incorporate the credible evidence rule. This

deadline was later extended to June 29, 2007.  On June 29, 2007, EPA finally took action on

CBD's petition.  The agreement also provides that within 60 days after receipt of TVA's

forthcoming permit application to EPA for a Title V permit for the Paradise Plant, EPA shall

conclude a completeness determination.  Then, within 18 months after determining the

application is complete, EPA shall take final action on the permit application.  The agreement

further provided that  EPA did not need to take final action on the permit application if Kentucky

DAQ submits a new proposed Title V permit for the Paradise Plant to EPA pursuant to its

operating permit program that EPA determines adequately addresses the issues raised by EPA in

its February 18, 2006, objection letter, and (2) EPA provides Plaintiffs' counsel with written

notice that EPA has determined that the new proposed CAA Title V permit from Kentucky DAQ

adequately addresses the issues raised by EPA in its February 18, 2006 objections.

Kentucky DAQ did submit a new revised Title V  permit for TVA Paradise and on

January 11, 2008 EPA provided Plaintiffs counsel with written notice that EPA determined that

the new proposed Title V permit adequately addressed EPA's issues.  Thus, through this suit,

Plaintiffs obtain a response to their Title V petition for an objection to the TVA Paradise Title V

permit, a response to their petition regarding the Kentucky SIP and the Credible Evidence Rule

and a new (and final) Title V permit for TVA Paradise that obviated the need for EPA to modify,

terminate or revoke and issue or deny a Title V permit for TVA Paradise.

## V.    ARGUMENT

### A.    PLAINTIFFS ARE ENTITLED TO RECOVER DOJ LAFFEY MATIX RATES

Plaintiffs are entitled to an award of costs of litigation, including attorneys' fees, pursuant

to Clean Air Act § 304(d), 42 U.S.C. § 7604(d).  That provision provides:  "The court, in issuing

any final order in any action brought pursuant to subsection (a) of this section, may award costs

of litigation (including reasonable attorney and expert witness fees) to any party, whenever the

court determines such award is appropriate." Id. An attorneys' fee award is "appropriate" to

parties who "prevail" or "prevail in part": i.e., who achieve "some degree of success on the

merits." Ruckelshaus v. Sierra Club, 463 U.S. 680, 689, 694 (1982). Plaintiffs have met this test,

having obtained substantial relief through a settlement agreement. See Sierra Club v. E.P.A., 322

F.3d 718, 719 (D.C. Cir. 2003).

The amount of fees Plaintiffs are requesting is calculated by the "lodestar" method:

reasonable hourly rates multiplied by the number of hours reasonably spent on the litigation.

Blanchard v. Bergeron, 489 U.S. 87, 94 (1989). The hourly rate charged by Plaintiffs here is

equivalent to the "Laffey Matrix," as calculated by the U.S. Department of Justice. See Ukeiley

Decl., Ex 1 (U.S. Attorney Office's Laffey Matrix webpage). In this Circuit, it is well

established that hourly rates for purposes of awards under fee-shifting statutes may be calculated

based on the rates set forth in Laffey v. Northwest Airlines, Inc., 746 F.2d 4 (D.C. Cir. 1984), for

1981-82, as adjusted by changes in the Consumer Price Index for the Washington, D.C.

Metropolitan area. See, e.g., Covington v. District of Columbia, 57 F.3d 1101, 1105 n. 14, 1109

(D.C. Cir. 1995), cert. denied, 516 U.S. 1115 (1996); Northwest Coalition for Alternatives to

Pesticides v. EPA, 421 F.Supp.2d 123, 129 (D.D.C. 2006) (awarding fees and noting: "[Plaintiff]

requests, and defendant does not oppose, that hourly fees be calculated under the Laffey Matrix);

Cobell v. Norton, 407 F.Supp.2d 140, 169-170 (D.D.C. 2005) (awarding fees at Laffey Matrix

rates under lodestar method); Judicial Watch v. Department of Commerce, 384 F.Supp.2d 163,

170 (D.D.C. 2005), aff'd in part and rev'd in part on other grounds 470 F.3d 363 (2006)

(awarding fees and noting: "[Defendant] does not oppose the use of the Laffey Matrix to

determine the rates owed to Judicial Watch and the Court finds the rates to be reasonable.").

As the Court of Appeals has explained, Laffey Matrix rates are within the market rates for attorneys of comparable experience doing comparable work. See Covington, 57 F.3d at 1109 ("In order to demonstrate [the market rate], plaintiff may point to such evidence as an updated version of the Laffey matrix or the U.S. Attorneys matrix").  The rates to be used are the rates that were in effect for each year in which the work was performed. See Masonry Masters, Inc. v. Nelson, 105 F.3d 708, 710 (D.C. Cir. 1997).

> **1.    Plaintiffs' Counsel from the Law Office of Robert Ukeiley Are Entitled to an Hourly Rate Based on the Laffey Matrix, Despite the Fact that Ukeiley lives in Kentucky.**

The correct legal market for calculating the award in this case is the Washington, D.C. market:

> The proper rule is that the relevant community is the one in which the district court sits. This is a simple rule to follow. It requires the district court normally to determine only the prevailing market rate within its jurisdiction, an inquiry about which it should develop expertise. Moreover, it is a neutral rule, which will not work to any clear advantage for either those seeking attorneys' fees, or those paying them.

Donnell v. U.S., 682 F.2d 240, 251 (D.C. Cir. 1982), cert. denied 459 U.S. 1204 (1983).

In a later decision, the Court of Appeals confirmed the general rule set forth in Donnell, but adopted a narrow exception "where the bulk of the work is done outside the jurisdiction of the court *and* where there is a *very significant* difference in compensation favoring D.C."  Davis County Solid Waste Mgmt. v. EPA, 169 F.3d 755, 758 (D.C. Cir. 1999) (emphasis in original). In Davis, the prevailing plaintiff sought recovery of attorneys fees at D.C. rates for their Utah counsel – rates which were about 70% higher than the firm's Utah rates.  The basis for this new exception in Davis was to "prevent the occasional erratic result where the successful petitioner is vastly overcompensated given the amount he ***contracted to pay*** for legal services. In all other cases the D.C. forum rates would apply."  Id. (emphasis added).  The Davis decision was plainly

tied to the "extreme situation" presented by the facts of that case: "We think the neutrality rationale in <u>Donnell</u> is still sufficient to justify forum rates in all but the ***extreme situation*** we face here." <u>Id.</u> at 759. (emphasis added).[3]

Applying the rules to the case at bar, Robert Ukeiley is entitled to $280 per hour for work done before May 31, 2005, $360 for hours between June 1, 2005 and May 31, 2006, $375 for hours between June 1, 2006 and May 31, 2007 and $390 for hours after June 1, 2007. These are the rates provided for him in the U.S. Attorney's Office for the District of Columbia's adjusted Laffey Matrix.

The D.C. Circuit has explained that there are at least three factors to consider in determining a reasonable rate; billing practice of a lawyer, the lawyer's experience, skill and reputation and the prevailing market rate. <u>Covington</u>, 57 F.3d at 1107. Turning first to his billing practice, Ukeiley has a 100% public interest environmental law private practice.[4] He only

---

[3] The <u>Davis</u> decision, based on the rationale of preventing a windfall to a successful plaintiff is contrary to the Supreme Court's decision in <u>Missouri v. Jenkins</u>, 491 U.S. 274, 287 (1989) which rejected the anti-windfall rationale. ("Neither petitioners nor anyone else, to our knowledge, has ever suggested that the hourly rate applied to the work of an associate attorney in a law firm creates a windfall for the firm's partners or is otherwise improper under § 1988, merely because it exceeds the cost of the attorney's services. If the fees are consistent with market rates and practices, the "windfall" argument has no more force with regard to paralegals than it does for associates.) However, the Court need not address the legal validity of <u>Davis</u> because it is factual distinguishable from the present case where Plaintiffs were represented on a *pro bono* basis so that they can have no windfall between what he paid and what they recovered and Plaintiffs' counsels' actual rates are at or close to the U.S. Attorney's Office's revised Laffey Matrix rates.

[4] To be completely accurate, on December 10, 2007, Ukeiley started as a staff attorney and director of the Climate and Energy program at Forest Guardians, a non-profit conservation organization. Forest Guardians' main office is in Santa Fe, New Mexico. Ukeiley remotely works out of Forest Guardians' Denver office. However, Ukeiley continues to live in Kentucky for personal reasons. Ukeiley's position with Forest Guardians is full time but allows him to wrap up his existing cases from his public interest environmental law private practice. On January 28, 2008, Forest Guardians changed its name to WildEarth Guardians. This motion and

represents groups or individuals in enforcing federal environmental laws or state laws or

regulations implementing federal environmental laws.  His practice only seeks injunctive or

declaratory relief or civil penalties that go to the federal treasury rather than plaintiffs.[5]

Ukeiley's practice focuses predominately on the Clean Air Act, with a lesser focus on the

Endangered Species Act.  Ukeiley's practice predominately involves representing non-profit

organizations, with the occasional individual named as a co-plaintiff; although on rare occasions,

the practice does involve representing public interest minded individuals. Ukeiley Decl. ¶¶ 19-

20.

  Ukeiley's practice involves charging "variable rates (both at and below the market, with

the latter attributable to public-spirited goals" of maximizing environmental and public health

protection.  See Covington, 57 F.3d at 1108.  Ukeiley represents labor unions and individual

members of labor unions regarding Clean Air Act permits issued by the Indiana Department of

Environmental Management.  In these matters, Ukeiley charges a rate equate to the DOJ Laffey

Matrix, although in the latest matters, he has charged $360 per hour, which reflects last year's

DOJ Laffey Matrix rate.  Ukeiley charges his market rate to these clients because he believes

charging this rate will not affect the degree of environmental protection, considering the relative

resources available to the labor unions.  This rate reflects the market rate for his services.  Since

incorporating his present law firm in December of 2003 and June of 2007, Ukeiley has worked

on 14 of these matters.  He has billed and collected over $66,000 at rates equate to DOJ Laffey

Matrix rates, or rates equal to the previous year DOJ Laffey Matrix rates, for this work.  These

are not fee shifting matters, so the client is paying Ukeiley's market rate with no ability to recoup

---

supporting affidavit are based on facts largely as of 7/13/07, which is when Ukeiley submitted a
declaration supporting fees in another case in this Court.
[5] This is not to imply that monetary damages cannot serve the public interest.

these fees. This represents a substantial portion of the firm's total income because of the firm's public interest nature. Ukeiley Decl. ¶¶ 21-25.

Ukeiley's market rate is equal to the DOJ Laffey Matrix because Ukeiley's firm has a nationwide practice and the majority of its work is in D.C. courts. For example, in June, 2007, the firm had 16 cases in active litigation. Of these 16 cases, nine were in this Court (the U.S. District Court for the District of Columbia), one in the U.S. Court of Appeals for the District of Columbia Circuit, one in the U.S. District Court for the Northern District of Georgia, one in the U.S. District Court for the Southern District of Ohio, one in front of an Administrative Law Judge of the Kentucky Environment and Public Protection Cabinet, one in the Pennsylvania Supreme Court, one in the United States Court of Appeals for the Eleventh Circuit, and one in the Franklin County, Kentucky Circuit Court. However, in the Franklin County Circuit Court, there was a Kentucky lawyer who serves the role of local counsel. Ukeiley was involved in this last case, as well as the case in front of the Kentucky Administrative Law Judge, because the cases involve Clean Air Act challenges to coal fired power plants, which is Ukeiley's specialty. He represents the Sierra Club in these two cases in Kentucky. The Sierra Club is a nationwide environmental organization based in San Francisco, California. Thus, Ukeiley's practice is issue-based rather than place-based. Ukeiley lives in Kentucky simply for personal reasons. Ukeiley Decl. ¶¶ 26-27.

Ukeiley's bar membership also reflects the nationwide scope of his practice. Ukeiley is admitted to the Maryland (inactive status), Colorado, Georgia and Kentucky state bars as well as to: U.S. Court of Appeals for the 10th Circuit, U.S. District Court for the District of Colorado, U.S. Court of Appeals for the D.C. Circuit, U.S. District Court for the District of Arizona, U.S. District Court for the District of Maryland (inactive), Supreme Court of the United States, U.S.

District Court for the District of Columbia, U.S. Court of Appeals for the 11th Circuit, U.S. District Court for the Southern District of Georgia, U.S. District Court for the Middle District of Georgia, U.S. District Court for the Northern District of Georgia, U.S. Court of Appeals for the 2d Circuit, U.S. District Court for the Eastern District of Kentucky, and the U.S. Court of Appeals for the 9th Circuit. Although admitted to the Eastern District of Kentucky, Ukeiley has never filed or participated in a case in that court. Ukeiley has also been admitted *pro hac vice* to: U.S. District Court for the Southern District of Ohio, and U.S. District Court for the Middle District of Pennsylvania. Ukeiley Decl. ¶ 28.

Ukeiley's work in the D.C. District Court stretches back to his law school days. While attending George Washington University (GW) Law School in D.C., Ukeiley worked for Professor Jennifer Lyman at the GW Law School Clinic from 1993 to 1995. One of Ukeiley's principle responsibilities as Prof. Lyman's research assistant was to help litigate two civil rights cases in the D.C. District Court which Prof. Lyman had inherited from the previous clinical professor. Ukeiley also interned at the Federal Public Defender's Office in D.C. during law school, thus increasing his early experience with the D.C. District Court.[6] Over the course of his career, Ukeiley has practiced more cases in the D.C. District Court than in any other court. Ukeiley Decl. ¶¶ 29-31.

Ukeiley's law practice-related connection to Kentucky is very limited. For example, Ukeiley has never had a client physically in his office in Kentucky. Ukeiley does a considerable amount of his work outside his office and outside Kentucky. Ukeiley has no cases in which he only represents Kentucky clients. Ukeiley has never filed a case in federal court in Kentucky. For the one and only case he filed in state court in Kentucky, he had co-counsel from Kentucky

---

[6] During law school, Ukeiley also interned for a semester with the U.S. Department of Justice's Environmental Crimes Section but none of this work involved cases in D.C. courts.

who serves as local counsel, as well as co-counsel from California.  Ukeiley Decl. ¶¶ 32-33.

Besides work for the labor unions, the rest of Ukeiley's firm's work was all on a *pro bono* basis.  This *pro bono* work can be divided into three categories in terms of billing.  The first category is *pro bono* work in which the firm receives no income at all and has no possibility of receiving any income.  This includes work representing clients as well as consulting with other public interest lawyers on Clean Air Act work who seek Ukeiley's opinions.  For example, during the week of June 11 – 15, 2007, Ukeiley received an e-mail from a public interest lawyer working for a non-profit in D.C. (who is a former high ranking US EPA official) seeking his opinion on a Clean Air Act question, an e-mail from a public interest lawyer working for a non-profit environmental law firm in Alaska seeking his opinion on a Clean Air Act question, an e-mail from a public interest lawyer working for a non-profit environmental law firm in Colorado seeking his opinion on a Clean Air Act question, and an e-mail from Ukeiley's former associate, who is now a public interest lawyer working for a large non-profit environmental law firm in D.C., seeking his opinion on a Clean Air Act question.  This level of *pro bono* consultation with the public interest environmental bar on Clean Air Act issues is typical for Ukeiley.  Ukeiley Decl. ¶¶ 34-35.

The second type of *pro bono* arrangement is where Ukeiley's firm does not charge the client anything for their time but hopes to recovery under a statutory fee shifting provision.  This case is an example of this type of *pro bono* arraignment.  Full recovery at market rates in these cases is critical for the financial viability of Ukeiley's public interest firm.  Ukeiley Decl.¶ 36.

The third type of *pro bono* is what public interest lawyers sometimes refer to as "low bono" or a reduced rate case.  Ukeiley's firm offers these reduced rates because, simply put, the work would not otherwise get done.  Ukeiley almost always strongly encourages and often

facilitates the clients seeking free representation from a non-profit public interest law firm and only takes the case on a "low bono" basis when there is no representation available for free. Ukeiley Decl. ¶ 37.

Ukeiley currently charges approximately $90 per hour for these low bono cases. This is not a market rate but rather a rate chosen to allow the public interest environmental work to get done. Ukeiley's firm charges the same $90 for himself and for his first year associates in these cases. In addition, Ukeiley's firm almost always agrees to a cap on the total amount that he will charge for lawyer time in these low bono cases. These caps results in the effective rate often ending up in the $45 range because the firm puts in almost as much unbillable time into the case as billable time. Ukeiley Decl. 38.

Further, in setting the market rate, the Court "should consider what rate would be commensurate with the attorney's skill and experience, and with the quality of the attorney's work." Salazar v. Dist. of Columbia, 123 F.Supp.2d 8, 14 (D.D.C. 2000), citing Covington, 136 F. 3d at 807. As to experience, reputation and skill as it relates to this case, Ukeiley has spent his entire career working for non-profit public interest environmental law firms or for-profit public interest law firms. His practice has been almost all public interest environmental litigation, although early on in his career, Ukeiley accepted some court- appointed civil rights cases and served as a court appointed alternative criminal defense counsel. In addition, Ukeiley's initial position after law school was in the nature of a public interest, international environmental lobbyist, working on treaties that govern the take of dolphins when fishing and other topics. Ukeiley Decl. ¶ 39.

Currently, Ukeiley is one of the most experienced Title V litigators on the public interest

side in the country.[7] <u>See</u> <u>e.g.</u> Attached Declaration of Pat Gallagher In Support of Plaintiffs'

Motion for Award of Attorney Fees and Costs ("Gallagher Decl.") at ¶ 6 (Head of Sierra Club

law program states " I consider Ukeiley to be one of the most knowledgeable public interest

environmental lawyers regarding Clean Air Act matters, and especially Clean Air Act matters

involving power plants, such as this case, in the country.") In a Title V case Ukeiley litigated, the

11th Circuit recently noted that: "Navigating through the intricacies of the Clean Air Act is no

task for the uninformed or the short-winded." <u>Sierra Club v. Johnson</u>, 436 F.3d 1269, 1272 (11th

Cir. 2006).  Ukeiley Decl. ¶ 40.  Specifically, Ukeiley has drafted comments, or supervised

others writing comments on dozens of Title V permits.  Ukeiley has drafted or supervised others

writing approximately 16 Title V petitions for objections.  Ukeiley has litigated or is currently

litigating approximately ten Title V petition deadline suits similar to this case.  This included one

Title V petition deadline case in which Ukeiley unsuccessfully tried to end EPA's pattern and

practice of failing to comply with the mandatory 60-day deadline to respond to Title V petitions.

<u>See</u> <u>New York Public Interest Research Group v. Whitman</u>, 214 F.Supp. 2d 1 (D.D.C. 2002).

Had EPA's vigorous defense not succeeded in that case, at least one claim for relief in the

present case would not have existed.  Ukeiley Decl. ¶ 41.

　　Ukeiley litigated, from drafting the comments on the State-issued Title V permit all the

way through outlining the reply brief in the appellate courts two substantive challenges to EPA's

response to Title V petitions, <u>Sierra Club v. Leavitt</u>, 368 F.3d 1300 (11th Cir. 2004) and <u>Sierra</u>

---

[7] This may seek like quite a boast, considering that Ukeiley only graduated law school in 1995.
However, Title V was only passed in 1990 and was not really implemented much before 1995 as
the EPA delayed in promulgating the Title V regulations.  In addition, it is not a very frequently
litigated provision, in the relative sense.

Club v. Johnson, 436 F.3d 1269 (11th Cir. 2006).[8]  Ukeiley also litigated Sierra Club v. Johnson,

06-10714 in the 11th Circuit which is another challenge to EPA's response to a Title V petition.

Ukeiley has also spent close to 100 days in trials of state-issued Title V permits in front of

Administrative Law Judges.  Ukeiley has litigated one case against the State of Georgia for

systemic delays in issuing Title V permits and one case against EPA for systemic problems with

the Georgia Title V program.   As to enforcement, Ukeiley litigated for almost five years a

federal Clean Air Act citizen suit that involved, in part, enforcing a Title V permit and resulted in

several published opinions.  See e.g. Sierra Club v. Georgia Power Company, 365 F.Supp.2d

1287 (N.D. Ga. 2004); Sierra Club v. Georgia Power Company, 365 F.Supp.2d 1297 (N.D. Ga.

2004) rev'd 443 F.3d 1346 (11th Cir. 2006).  Ukeiley has also been litigating since 2004 an on-

going Clean Air Act citizen suit involving, in part, enforcement of a Title V permit and

Prevention of Significant Deterioration requirements against a coal-fired power plant.  See Sierra

Club v. Dayton Power & Light, 04-905 (S.D. Ohio).  Ukeiley Decl. ¶¶ 42-43.

        EPA must recognize Ukeiley's Clean Air Act experience, skill and reputation, as they

have had him teach at least one of EPA's Clean Air Act Prevention of Significant Deterioration

(PSD) and Non-Attainment New Source Review citizen trainings.  PSD and NA NSR are other

parts of the Clean Air Act, which are applicable requirements that must be included in Title V

permits.  See 40 CFR § 70.2 Applicable requirements (2).  EPA and EPA's contractor also asked

Ukeiley to edit EPA's citizen's guide to PSD and NA NSR.  Finally, EPA's Title V Performance

Task Force chose Ukeiley as one of the people to interview to gain a better understanding of how

the Title V program was actually working.  Ukeiley's other teaching experience includes

---

[8] Ukeiley's name does not appear on the published decisions because he did not participate in the oral argument, as he left his employment with the Georgia Center for Law in the Public Interest prior to those oral arguments.

teaching Continuing Legal Education (CLE) courses on the Clean Air Act and power plants at the Public Interest Environmental Law Conference in Eugene, Oregon for at least the past three years.  Ukeiley has also been a presenter on Clean Air Act issues at several Sierra Club events in the last few years.  Ukeiley Decl. ¶¶ 44-45.

Over the years, Ukeiley has done more work for the Sierra Club than for any other client. Last year, the Sierra Club named Ukeiley as one of their "Legal Heroes."  See http://www.sierraclub.org/environmentallaw/heroes/robert_ukeiley.asp (last visited 6/16/07). Ukeiley Decl. ¶ 46.

Finally, turning to the prevailing market rates, Ukeiley is asking for the DOJ Laffey Matrix rate for D.C.  As explained above, courts have long accepted use of an adjusted Laffey Matrix rate as an efficient way to determine a reasonable rate. See Salazar v. Dist. of Columbia, 123 F.Supp.2d 8, 14 (D.D.C. 2000).

It is important to note that use of the DOJ Laffey Matrix rate represents a major compromise by Plaintiffs as Plaintiffs are actually entitled to a much higher rate.  This is because the manner in which the U.S. Attorney's Office adjusts the Laffey Matrix substantially underestimates the appropriate rate.  Plaintiff is only asking $375 for Ukeiley's time last year based on the DOJ Laffey Matrix.  However, a properly adjusted Laffey Matrix would provide for $509 per hour or over 35% more than what Plaintiff is requesting.  See http://www.laffeymatrix.com/see.html (last visited 10/4/07) citing to McDowell v. District of Columbia, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); Salazar, 123 F.Supp.2d 8; see also Interfaith Cmty. Org. v. Honeywell Int'l, 336 F.Supp.2d 370, 386 – 388 (D.N.J. 2004) citing Salazar, 123 F.Supp.2d at 13-15 aff'd 426 F.3d 694 (3d Cir. 2005).  In Interfaith Cmty. Org., the Third Circuit affirmed the rate of $456 as a

reasonable rate in D.C. in 2003 for a lawyer with Ukeiley's range of experience.  Interfaith Cmty Org., 426 F.3d at 708 n. 11.  In comparison, Plaintiff is asking $375 for Ukeiley for work done in 2007.[9]

Plaintiffs are also asking for DOJ Laffey Matrix Rates for Audrey Baldwin, who was a first year associate in the Law Office of Robert Ukeiley. The analysis above with regard to Ukeiley generally applies to Ms. Baldwin, and she is entitled to an hourly rate of $205.  See Ukeiley Decl., Ex. 1.   Baldwin is a 2005 graduate of Lewis and Clark Law School.  She received a certificate in environmental and natural resources law.  She also received the environmental alumni association's Williamson Award, which is awarded to one graduate per year who has demonstrated an outstanding commitment to public interest environmental work.  During law school, she had a summer position at a non-profit public interest environmental law firm and during the school year, she worked at the law school's environmental clinic.  Baldwin is actually paid at the DOJ Laffey Matrix rate for Clean Air Act work for various labor unions or individual labor union members, although as of May 2007, she was still billing at last year's rate ($195 per hour).  The rest of her work was done on a *pro bono* basis as described above with regard to Ukeiley.  Ukeiley Decl. ¶ 50.[10]

Although this case resolved rapidly, so counsel were not required to travel to D.C., this case does not even approximate the "extreme situation" faced in Davis.  Plaintiffs' counsel are private attorneys with their practice dedicated to representing non-profit organizations and individuals in cases of public importance and national significance. With respect to Ukeiley, the

---

[9] Although irrelevant, it is interesting to note that the $375 rate for Ukeiley is within the range of rates charged by partners at law firms in and around Kentucky according to a National Law Journal article provided to Plaintiff's counsel by a DOJ counsel working on another Title V petition deadline suit.  See Ukeiley Decl. ¶ 56 & Exhibit 4.
[10] Baldwin is currently a staff attorney at the Pacific Environmental Advocacy Center at Lewis and Clark Law School in Portland, Oregon.

DOJ Laffey Matrix rate of $375 reflects the rate he actually charges to his non-*pro bono* clients adjusted for the current year.  Because the rates regularly charged by Ukeiley are only modestly below or equivalent to the DOJ Laffey Matrix rates, the <u>Davis</u> exception is inapplicable. Defendants will not be able to produce any evidence that an attorney with Ukeiley's experience, skill and reputation doing the type of work Ukeiley does with an office in Berea, Kentucky charges rates that are any less than the DOJ Laffey Matrix rates.

Nor is the <u>Davis</u> analysis even applicable in this case, since all counsel represented Plaintiffs here on a *pro bono* basis, with only the filing fee and other case costs covered by Plaintiffs, and payment of attorneys' fees contingent upon success.  This is the precise type of public interest-minded litigation Congress contemplated in developing the Clean Air Act citizen suit provision (and similar fee-shifting provisions in federal law).  <u>See</u> S. Rep. No. 94-1011, at 6, 1976 U.S.C.C.A.N. 5908, 5913 (Senate Report accompanying 42 U.S.C. § 1988), cited with approval in <u>Blum v. Stenson</u>, 465 U.S. 886 (1984); <u>Pennsylvania v. Del. Valley Citizens Council for Clean Air</u>, 478 U.S. 546, 559 (1986) (purposes behind Clean Air Act § 304(d) and § 1988 are "nearly identical"); see also <u>Covington</u>, 57 F.3d at 1107-08.  As noted above, the exception in <u>Davis</u> was to "prevent the occasional erratic result where the successful petitioner is vastly overcompensated given the amount he contracted to pay for legal services."  <u>Davis</u>, 169 F.3d at 758.  There is zero risk of such overcompensation here, since Plaintiffs did not compensate their counsel at all.  Ukeiley Decl. ¶ 36.

In sum, because Ukeiley and Baldwin's actual rate charged to non-pro bono clients is the same or almost the same as the DOJ Laffey Matrix rate, because Ukeiley has considerable experience and skill and enjoys a strong national reputation in a very specialized practice area, even with EPA, with regard to Clean Air Act and Title V litigation, and because the DOJ Laffey

Matrix rate represents or actually under-represents the prevailing market rate in the forum of this case, the DOJ Laffey Matrix rates are reasonable in this case.

> **2.    Plaintiff's Counsel Tim Ballo, Who Resided and Worked in New York City, is Entitled to an Hourly Rate Based on the D.C. Laffey Matrix.**

Plaintiffs seek an award of attorney fees for Tim Ballo at the DOJ Laffey Matrix rate of $115/hour for law clerks.  Mr. Ballo's time on the attached billing statement includes 8 hours.[11] See Declaration of Timothy Ballo in Support of Plaintiffs' Motion for Award of Attorneys' Fees and Costs ("Ballo Decl.") Ex 1.   Ballo is a 2004 graduate of Washington & Lee Law School. He was admitted to the Virginia bar on October 31, 2005 and worked with Robert Ukeiley for two years, before taking a position with Earthjustice in D.C.  Mr. Ballo specializes in environmental law and, like Ms. Baldwin, did not have clients in Kentucky. Ballo Decl. ¶¶ 3,4,5, & 8.  Ballo performed all work in this case while physically located in New York City, not Kentucky.  Ballo Decl. ¶ 7.  This arrangement was possible because Ukeiley has a nationwide, issue-based practice that is not limited by physical location.  Applying Kentucky based rates to Ballo, who does not reside in Kentucky and did not do his work on this case in Kentucky, would be nonsensical.

> **3.    Plaintiffs Should Recover for Ashley Wilmes at DOJ Laffey Matrix Rates**

Like Ballo, Ashley Wilmes did not live or have an office in Kentucky while doing her work on this case, which came after Ballo and Baldwin were done with their work on this case. Declaration of Ashley D. Wilmes in Support of Plaintiffs' Motion for Award of Attorneys Fees and Costs ("Wilmes Decl.") at ¶¶ 4-5.  A 2002 graduate of University of Oregon Law School with a certificate in Environmental and Nature Resource Law, Wilmes is seeking $245 per hour

---

[11] Ballo's, Baldwin's and Wilmes' time on this case does not overlap. There were only two lawyers, a partner level and associate level lawyer, working on this case at any given time.

which is the DOJ Laffey Matrix rate for working during 2006-2007 for an attorney with 4-7

years of experience.  Id. at ¶ 6.  After exercising her billing discretion to reduce her hours by

15%, she is requesting 24.2 billable hours, which creates a loadstar of $5929.  Id. at ¶¶ 7-8.

### 4.    Plaintiffs' Claims Were Properly Venued in the District Court for the District of Columbia and Plaintiffs' Counsel Are Entitled to D.C. Rates

EPA will likely contend that if this case had not settled the case would have been

dismissed for improper venue or transferred to the Western District of Kentucky.  Therefore,

EPA's novel argument goes, D.C. rates should not be applied in this case.  Plaintiffs are not

aware of any legal support for this novel theory.  In any event, EPA is wrong that this Court was

not the proper venue.

Although this Court did not rule on Defendants' Motion to Dismiss for Improper Venue,

or in the Alternative to Transfer, D.C. was the appropriate venue for this case.  See Plaintiffs'

Memorandum in Opposition to EPA's Motion to Dismiss or Transfer, R. 10 ("Plaintiffs'

Response"), pp. 17-25.  Most of the events or omissions giving rise to Plaintiffs' claims occurred

in the District of Columbia, although some occurred in EPA Region 4 office in Atlanta, Georgia

or EPA Office of Air Quality Planning and Standards in Research Triangle Park, North Carolina.

In addition, Defendant Steven Johnson and Defendant U.S. EPA officially reside in the District

of Columbia.  Thus, venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e).

Furthermore, Plaintiff CBD is headquartered in Tucson, Arizona, with offices in

Washington D.C.[12]   EPA's counsel is obviously conveniently located in Washington, D.C.

Although undersigned counsel lives in Kentucky for personal reasons, he has practiced

more cases in this Court than in any other court.  He is not even a member of the bar of the

---

[12] Plaintiff Hilary Lambert lives in Lexington, which is in the Eastern, not Western, District of Kentucky.

Western District of Kentucky, where Defendants proposed this case be transferred, and he has never filed a case in any federal court in Kentucky.  Venue in this District was proper and served the interests of convenience, judicial efficiency, and fairness.

> **a.    The District of Columbia Was Clearly The Most Appropriate Venue for CBD's First and Second Claims for Relief.**

EPA admitted that this District was a proper venue for CBD's First and Second Claims for Relief.  See EPA Memorandum in Support of EPA's Motion to Dismiss for Improper Venue, or, in the Alternative, to Transfer [Dk #8] ("EPA Memo to Dismiss") at 12.  As explained in Plaintiffs' Memorandum in Opposition to EPA's Motion to Dismiss, or in the Alternative, to Transfer [Dk #10] ("CBD Opposition Memo"), CBD's First and Second Claims for Relief sought to compel the EPA Administrator to perform his non-discretionary duties and were subject to the general federal venue provision, 28 U.S.C. § 1391, thus making venue undeniably proper in this Court.  See CBD Opposition Memo at 17-19.

CBD's First Claim for Relief challenged EPA's failure to respond to CBD's petition for an objection to the TVA Paradise Title V permit within 60 days, as required by 42 U.S.C. § 7661(b)(2).  Complaint, p. 24. This is a non-discretionary duty and the Administrator is statutorily precluded from delegating his responsibility to respond to Title V petitions, in Kentucky or elsewhere. 42 U.S.C. § 7661d(b)(2).  Venue was appropriate under 28 U.S.C. § 1391 because the omission arose in the District of Columbia, where the decision maker is located.[13]  Further, the evidence and witnesses are in the District of Columbia and to extent they

---

[13] This Court has regularly entertained claims like this where plaintiffs challenge the EPA's failure to comply with the 60 day deadline in 42 U.S.C. § 7661d(b)(2) when the Title V permits are for pollution sources outside the District of Columbia.  See e.g. New York Public Interest Research Group and Sierra Club v. Whitman, 214 F. Supp. 2d. 1 (D.D.C. 2002); Sierra Club v. Johnson, 05-cv-750 (ESH)(D.D.C. 2005); Sierra Club v. Johnson, 05-cv-2177 (RMC)(D.D.C.

are not, they would be in Atlanta, Georgia or Research Triangle Park, North Carolina, not the Western District of Kentucky. Thus, this District was the most appropriate forum for CBD's First Claim for Relief.

CBD's Second Claim for Relief challenged EPA's failure to modify, terminate or revoke the TVA Paradise Title V permit and issue or deny the permit themselves. Complaint, p.25. This challenge was also most appropriately venued in the District of Columbia. Again, Defendants reside in the District of Columbia, and the relevant documents and decision makers are located in this District and possibly Atlanta, Georgia and/or Research Triangle Park, North Carolina. The challenge is not to Kentucky's administration of its Title V program, but to EPA's failure to satisfy its mandatory duty to take action under the Clean Air Act. EPA has no staff or records in Kentucky relevant to this case. Thus, Plaintiffs' First and Second Claims find proper venue in this Court, which is also the most convenient venue.

      **b.**      **Venue in the District of Columbia was Proper for CBD's Third and Fourth Claims for Relief**

This Court was also the proper venue for Plaintiffs' unreasonable delay claims. As explained in Plaintiff's Response, pp.19-25, venue for over CBD's Third and Fourth Claims was appropriate because (1) the Court would not have needed to address CBD's Third Claim as it was an alternative claim (2) the Second and Third Claims for Relief comprise one cause of action with multiple grounds for relief; (3) venue is not necessarily limited by the specific Clean Air Act venue provisions; and (4) all Claims for Relief arise from a common nucleus of operative facts.

      **i.**      **Plaintiffs' Third Claim**

---

2005); Nichols v. Johnson, 05-cv- 2215(RCL)(D.D.C. 2005); Rocky Mountain Clean Air Action v. Johnson, 06-cv-1419 (RMC)(D.D.C. 2006).

Plaintiffs' Third Claim for Relief (unreasonable delay in modifying, terminating, or revoking, or issuing or denying, the TVA Paradise Title V Permit) was set forth as an alternative to Plaintiff's Second Claim for Relief (failure to modify, terminate or revoke, or issue or deny the proposed TVA Paradise Title V Permit). Thus, the Court never even had to address Plaintiffs' third claim for relief. See e.g. Sierra Club v. Johnson, 500 F.Supp.2d 936 (N.D. Ill. 2007) (denying EPA's motion to dismiss claim similar to CBD's second claim, which would have mooted third claim).

Furthermore, as discussed in CBD Opposition Memo, the District of Columbia Circuit has described two types of cases in which venue need not be established for each claim for relief. See Beattie v. United States, 756 F.2d 91, 100-104 (D.C. Cir.1984). The first is a case that amounts to one cause of action with multiple grounds for relief, in which proper venue as to one federal ground supports venue for the others. Id. at 100. The second is a case in which improperly venued claims for relief and properly venued claims arise from the same nucleus of operative facts, which is the pendent venue doctrine. Id. at 102 (citing Laffey v. Northwest Airlines, 321 F. Supp. 1041 (D.D.C. 1971); Zenith Radio Corp. v. Matsushita Electric Industrial Co., 402 F. Supp. 262 (E.D. Pa. 1975)). As explained in Plaintiffs' Opposition to EPA's Motion to Dismiss or Transfer, nothing in 42 U.S.C. § 7604(a) precludes the application of the single cause of action theory or the pendent venue doctrine. Plaintiffs Opposition Memo at 21. See also Beattie, 756 F. 2d at 100 (applying both the single cause of action theory and pendent venue to claims under the Federal Tort Claims Act, despite the restrictive venue statute applicable to those claims).

Here, venue for CBD's Third Claim for Relief was supported by proper venue for the First and Second Claims for Relief, and venue for the Third Claim for Relief was appropriate for

resolution in this District under the pendent venue doctrine. CBD's Third Claim for Relief challenged Defendants' unreasonable delay in modifying, terminating, revoking, issuing or denying the Title V permit for TVA Paradise.  The claim is presented in the alternative to the Second Claim for Relief, a mandatory duty claim challenging the same conduct and seeking the same remedy. EPA acknowledges that these two claims "seek to compel precisely the same EPA action."  EPA Memo to Dismiss at 12.  Thus, any argument that the two claims do not arise from a common nucleus of operative facts is totally without merit, as the only difference in the claims is the law CBD seeks to have the Court apply to those operative facts.

Furthermore, both the second and third claims sought to redress a single wrong, that is, Defendants' failure to terminate, revoke, issue or deny the Title V permit for TVA Paradise.  The parties and proof were identical, and any witnesses and evidence would be the same for each claim.  Therefore, proper venue for the Second Claim for Relief supported venue for the Third Claim for Relief, and both claims were properly venued in this Court.  See Beattie, 756 F.2d at 101.

### ii.    Plaintiffs' Fourth Claim for Relief

Finally, Plaintiffs' fourth claim for relief was that EPA was unreasonably delaying a response to CBD's Administrative Procedures Act ("APA") Petition for rule making regarding the Kentucky SIP's lack of an explicit recitation of the Credible Evidence Rule.  To begin with, it is important to recall that this "petition" was actually an alternative claim.  CBD's primary claim was that EPA should object to the TVA Paradise Title V permit because it does not contain an explicit recitation of the Credible Evidence Rule.  CBD's APA petition was only supposed to come into play if EPA denied CBD's Title V petition on the grounds the failure of the Kentucky SIP to include an explicit recitation of the Credible Evidence Rule justified the fact that the TVA

Paradise Title V permit did not include an explicit recitation of the Credible Evidence Rule.

### a.    Pendant Venue is Appropriate for Plaintiffs' Fourth Claim for Relief

Thus, even if it was true that Plaintiffs' unreasonable delay claim regarding their APA petition, that is the Fourth Claim for Relief, would not be properly venued in this Court if brought individually, the doctrine of pendant venue still applies, such that venue in this Court was proper as to all of Plaintiffs' Claims for Relief. See Plaintiffs' Response, pp.23-25.  Under the doctrine of pendent venue, a court may allow a plaintiff to pursue claims for which venue would not be individually proper. Beattie, 756 F.2d at 100; Burnett v. Al Baraka Inv. and Dev. Corp, 274 F. Supp. 2d 86, 98 (D.D.C. 2003) (citing Johnson v. Washington Gas Light Co., 89 F.Supp.2d 45, 47 (D.D.C.2000)).  In determining whether to permit improperly venued claims to proceed under the doctrine of pendent venue, the District of Columbia Circuit Court of Appeals has principally considered whether the claims originate from a common nucleus of operative fact as a test that "in itself, embodies factors that bear upon judicial economy, convenience, and fairness." Beattie at 103. The existence of similar witnesses and common issues of proof for each claim are also relevant considerations in applying the pendent venue doctrine. Burnett at 98. Though the most important consideration in a decision to exercise pendent venue is the existence of a common nucleus of operative facts, other factors include convenience, avoidance of piecemeal litigation, fairness, and the convenience of the court. Beattie, 756 F.2d at 103.

As Plaintiffs explained in their Response, all of the claims asserted by CBD arose from a common nucleus of operative fact, and all prudential considerations favored this Court's exercise of pendent venue.  CBD's Fourth Claim for Relief arises from that same nucleus of operative fact.  The operative facts are: (1) Kentucky purported to issue TVA Paradise a Title V permit that did not explicitly authorize the use of any credible evidence to establish compliance, or non-

compliance, with the permit; (2) Kentucky's basis for not including an explicit statement about the Credible Evidence Rule into the TVA Paradise Title V permit was the fact that the Kentucky SIP did not contain an explicit recitation of the Credible Evidence Rule, (3) CBD petitioned for an objection to the TVA Paradise Title V permit on seven grounds, including the failure to include a provision stating that anyone can use of any credible evidence to establish compliance or noncompliance; (4) included in CBD's Title V petition was a request in the alternative and pursuant to the APA that EPA issue a SIP Call to Kentucky to correct that deficiency in its SIP to add the Credible Evidence Rule; (5) EPA did not timely respond to CBD's Title V and APA petition.  All of CBD's four claims for relief arose from this nucleus of facts, including CBD's Fourth Claim for Relief.  Therefore, the Fourth Claims for relief satisfy the most important factor in determining whether to apply pendent venue.

> **b.    EPA Cannot Establish that the Clean Air Act Venue Provisions Prohibited Venue in This Court for the Fourth Claim for Relief**

In its Motion to Dismiss, EPA argued that the venue provision of 42 U.S.C. § 7604(a) dealing with agency action referred to in 42 U.S.C. § 7607(b) which is unreasonably delayed applied to CBD's unreasonable delay claims in this case, such that venue was only proper in a district court in the Sixth Circuit.  EPA Memo at 8-11.   However, EPA's argument is based on the unsupportable assumption that an appeal of EPA's final action on CBD's APA petition regarding the Credible Evidence Rule would be in the Sixth Circuit rather than the D.C. Circuit.

Under the citizen suit provision of the Clean Air Act, generally "an action to compel agency action referred to in [42 U.S.C. § 7607(b)] which is unreasonably delayed may only be filed in a United States District Court within the circuit in which such action would be reviewable under [42 U.S.C. § 7607(b)]." See 42 U.S.C. § 7604(a).  42 U.S.C. § 7607(b) then

provides that a petition for review of "nationally applicable regulations promulgated, or final action taken, by the Administrator under" the Clean Air Act must be filed in the U.S. Court of Appeals for the District of Columbia.   Furthermore, judicial review of a final action of the EPA Administrator that is "locally or regionally applicable" – but which the Administrator expressly finds at the time of the action is "based on a determination of nationwide scope or effect" – may only be filed in the U.S. Court of Appeals for the District of Columbia.  42 U.S.C. § 7607(b). This purpose of this venue provision is "to place nationally significant decisions in the D.C. Circuit."  <u>Texas Mun. Power Agency v. E.P.A</u>., 89 F.3d 858, 867 (D.C. Cir. 1996).

When this case was filed, EPA had not determined whether its decision regarding CBD's APA petition was "based on a determination of nationwide scope or effect" and EPA had not published a decision on such a determination, one way or the other.  EPA's argument about venue for Plaintiffs' Fourth Claim for Relief was thus based completely on speculation of whether an appeal of the final agency action which EPA was being sued for <u>not</u> taking would ultimately be appealed to the Sixth Circuit or the D.C. Circuit.  Speculation is not evidence and because the Motion to Dismiss or Transfer was EPA's motion, EPA would have had the burden and would have lost for failure to present actual evidence on this key point.

### c.    This Court's Exercise of Venue

Finally, this District was more convenient for all parties, their counsel, and any witnesses. Any necessary evidence was likely located in this District.  This Court was unquestionably the proper venue for half of CBD's action, as EPA acknowledged. EPA Memo at 12.  Resolution of all of CBD's claims in this District was proper to avoid the piecemeal litigation of those claims for which EPA challenged venue.  Exercise of pendent venue in this case was also fair to all parties. As CBD satisfied all prerequisites for the application of pendent venue to the Third and

Fourth Claims for relief, this Court had broad discretion to allow CBD's claims to go forward. As Plaintiffs correctly venued their Claims for Relief in this District, Plaintiffs should recover fees at the DOJ Laffey Matrix rates for this District.

5.    **The Court Should Penalize Public Interest Lawyers by Following <u>Rocky Mountain Clean Air Action v. Johnson,</u>**

EPA will likely cite to <u>Rocky Mountain Clean Air Act v. Johnson</u>, 06-1992 (JR) (DDC 2008) 1/28/08 Slip Op.  In that case, the court awarded fees based on a "canvass of recent decisions issuing from the Eastern District of Kentucky[.]"  <u>Id.</u> at 7.  The court ignored the undisputed evidence before it that the rates CBD is seeking for Ukeiley and Baldwin are the rate that Ukeiley actually charged and was paid for himself and his associate Baldwin for 100% of their non-*pro bono* work when they were doing work while seated in the legal market of Mr. Ukeiley's home, as well as the rate provided in the DOJ Laffey Matrix.  <u>See</u> Declaration of Robert Ukeiley in Support of Plaintiff's Motion for Award of Attorneys' Fees and Costs [Dk. #13-6] at ¶¶ 23, 49.  Two slight clarifications are that Ukeiley and Baldwin actually charged and were paid at a rate that reflected the prevision year rate on the DOJ Laffey Matrix rate and that the DOJ Matrix rate is substantially below actual District of Columbia hourly rates.  <u>See</u> <u>e.g.</u> <u>Salazar v. District of Columbia</u>, 123 F.Supp. 2d 8, 14-15 (D.D.C. 2000).

Thus, the non-binding authority EPA may cite does exactly what Congress did not intend to happen in enforcement actions under statutes with fee shifting provisions.  The <u>Rocky Mountain Clean Air Act</u> decision creates a clear financial disincentive for public interest minded attorneys like Ukeiley to take fee shifting cases.  Ukeiley could get paid $375 per hour for working on non-fee shifting cases or $225 per hour for working on fee shifting cases.  As Pat Gallagher, the head of Sierra Club's Environmental Law Program explains, such a disincentive

can thwart Congress' desire to see public welfare statutes like the Clean Air Act, enforced.  See Gallagher Decl. at ¶ 8.

The Rocky Mountain Clean Air Act decision also punishes Ukeiley for doing so much pro bono work in the past.  The Rocky Mountain Clean Air Act decision dismisses Ukeiley's actual market rate work as the "fortunate case[s]" that should be ignored.  Slip Op. at 5.  What the opinion ignores is the uncontested fact that 100% of Ukeiley's market rate work was paid at rates essentially equivalent to the DOJ Laffey Matrix rate.  Had Ukeiley done less pro bono work and more market rate work, presumably the slip opinion would not have excused this rate as the "fortunate case[s]."  Penalizing Ukeiley for spending the majority of his time on pro bono cases runs against Congress' intent to encourage lawyers to take fee shifting cases, as well as the rational behind the D.C. Circuit's decision in Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516, 1525 (D.C.Cir.1988) (en banc ) and bar associations' efforts to encourage more pro bono representation.

Finally, the Rocky Mountain Clean Air Action case did not address the situation of Ballo and Wilmes, two lawyers who did not live or work in Kentucky while working on this case.

**B.     Plaintiffs Claimed Hours are Reasonable**

**1.     Plaintiffs' Counsel's Hours Are Presumptively Reasonable**

The hours requested by CBD for this matter are reasonable.  Under federal fee-shifting statutes, Plaintiffs' attorneys are entitled to be compensated for every item of service which, at the time rendered, would have been undertaken by a reasonable and prudent lawyer to advance or protect the client's interest. See Blanchard v. Bergerson, 489 U.S. 87, 94 (1989); Nat'l Ass'n of Concerned Veterans v. Sec'y of Defense, 675 F.2d 1319, 1323-27 (D.C. Cir. 1982); see also Role Models America, Inc. v. Brownlee, 353 F.3d 962, 968 - 970 (D.C. Cir. 2004); Save Our

Cumberland Mountains v. Hodel, 857 F.2d 1516, 1522-24 (D.C. Cir. 1988).  As succinctly put forward by the Sixth Circuit:  "The question is not whether a party prevailed on a particular motion or whether in hindsight the time expenditure was strictly necessary to obtain the relief achieved.  Rather, the standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed." Wooldridge v. Marlene Industries Corp., 898 F.2d 1169, 1177 (6th Cir. 1990).

The hours claimed by Plaintiffs' attorneys here are described fully in their declarations and supporting contemporaneous time records.  As such, counsel's hours are presumptively reasonable: "Sworn testimony that, in fact, it took the time claimed is evidence of considerable weight on the issue of the time required in the usual case." Perkins v. Mobile Housing Bd., 847 F.2d 735, 738 (11th Cir. 1988).  To deny compensation, therefore, "it must appear that the time claimed is obviously and convincingly excessive under the circumstances." Id.

Plaintiffs counsel has consulted with defense counsel regarding most of their claimed hours and voluntarily deleted entries that defense counsel objected to in order to avoid wasting the Court's time on these issues.  For example Plaintiffs counsel consulted with the North Carolina Attorney General's office as North Carolina currently has a tort suit seeking injunctive relief against TVA Paradise, among other TVA plants.  It is certainly reasonable for counsel to keep apprised of a related matter.  Nevertheless, Plaintiffs have chosen to exercise their billing discretion and forgo the time Plaintiffs counsel spent consulting with the North Carolina Attorney General's office.  Thus, Plaintiffs do not anticipate that EPA will object to the hours Plaintiffs are claiming with the one exception discussed below.

### 2.    Plaintiffs are entitled to recover fees incurred in responding to Defendants' Motion to Dismiss or to Transfer.

Plaintiffs anticipate that EPA may argue that Plaintiffs are not entitled to recover for the

hours they spent opposing EPA's Motion to Dismiss or Transfer.  This argument would not be well founded.

The relevant question is whether Plaintiffs counsel exercised sound legal judgment under the circumstances and whether the success that was achieved warrants the full lodestar.  See City of Riverside, 477 U.S. at 572. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." Hensley v. Eckerhart, 461 U.S. 424, 436 (1983).  The fact that a claim, much less an opposition to a motion, is later rendered moot does not make the time spent on that issue unreasonable and thus unrecoverable. See e.g. Fed'n of Fly Fishers v. Daley, 200 F. Supp. 2d 1181, 1191 (D. Cal. 2002) ("Plaintiffs are entitled to be compensated for reasonable work done on the case, even when that work is rendered moot by subsequent events outside the control of plaintiffs.").  Rather, this court has ruled that a party can recover for even an unsuccessful motion.  See e.g. Falica v. Advance Tenant Services,  Inc., 384 F.Supp.2d 75, 81 ( D.D.C. 2005).

In this case, as explained above, Plaintiffs obtained all the relief they requested and the relief results in one of the largest sources of air pollution in the country finally have a final Title V permit.  Plaintiffs did not lose EPA's Motion to Dismiss or Transfer.  Rather, the parties reached a settlement before the Court decided the motion.  Thus, their time on the opposition to the motion, considered in the light of the overall results, was reasonable and compensable.  In any event, as explained above, Plaintiffs should have prevailed on their opposition to the Motion as EPA's arguments were in error.

### C.    Reasonable Hours Claimed

The appropriate lodestar for Plaintiffs' counsel is as follows:

| Attorney | Year | Yrs. Exp. | Rate | Hours | Total Fees |
|---|---|---|---|---|---|
| Robert Ukeiley | 07-08 | 12 | $390 | 17.1 | $6,669 |
| | 06-07 | 11 | $375 | 36.8 | $13,800 |
| | 05-06 | 10 | $290 | 7.3 | $2,117 |
| | 04-05 | 9 | $280 | 1.5 | $420 |
| Aubrey Baldwin | 06-07 | 1 | $205 | 91.6 | $18,778 |
| Tim Ballo | 05-06 | Law Clerk | $115 | 8 | $920 |
| Ashley Wilmes | 07-08 | 5 | $245 | 24.2 | $5,929 |
| Total Fees: | | | | | $48,633 |
| Costs: | | | | | $453.07 |
| Total Fees and Costs: | | | | | $49,086.07 |

### CONCLUSION

For the foregoing reasons, CBD respectfully request that the Court grant their Motion in the amount of $49,086.07 in attorneys' fees and costs plus time spent on the reply brief for this fee litigation which CBD will document by submitting a supplemental declaration.

Respectfully submitted,

_____
Robert Ukeiley (MD 14062)
Law Office of Robert Ukeiley
435R Chestnut Street, Ste. 1
Berea, KY 40403
Telephone: (859) 986-5402
Facsimile: (866) 618-1017
E-mail: rukeiley@igc.org
Dated: February 12, 2008            Counsel for Plaintiffs